******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# DEUTSCHE BANK AG *v.* SEBASTIAN HOLDINGS, INC., ET AL.
## (SC 20647)

Robinson, C. J., and D'Auria, Mullins, Ecker and Alexander, Js.

*Syllabus*

The plaintiff bank sought to enforce a foreign judgment that it had secured against the defendant S Co., a corporation organized under the laws of Turks and Caicos Islands. The foreign judgment resulted from an action previously brought by the plaintiff in England, in which the plaintiff recovered money owed in connection with an unpaid margin call on a foreign exchange portfolio of S Co., for which the plaintiff served as the primary broker. S Co.'s trading had been profitable between 2006 and the latter part of 2008, and, on October 7, 2008, a representative of the plaintiff informed the defendant V, S Co.'s sole shareholder and director, that S Co. held nearly $1 billion in its accounts. Nonetheless, as the financial and currency markets became increasingly volatile, S Co. faced hundreds of millions of dollars in losses. As a result, the plaintiff issued a series of margin calls on the portfolio. S Co. paid the first five margin calls in full from assets held at the plaintiff bank. The plaintiff's internal records showed, however, that the plaintiff had not properly valued and entered S Co.'s trades, which purportedly led to S Co.'s accounts being overvalued. Accordingly, on October 22, 2008, the plaintiff informed V of the computational errors, that S Co.'s accounts were in the red, and that it would seek a sixth margin call. S. Co. ultimately failed to pay the sixth margin call. Meanwhile, as a result of the plaintiff's representations regarding the value of S Co.'s accounts on October 7, and throughout that month, V caused S Co. to transfer a large portion of its assets to various entities associated with V in furtherance of V's plans to execute certain estate planning and to establish a trust for the benefit of his children. By the end of October, 2008, S Co.'s accounts with the plaintiff and other banks had been depleted, rendering S Co. effectively judgment proof. In 2013, the English court rendered judgment for the plaintiff and awarded it damages and interest. When S Co. failed to pay the foreign judgment, the plaintiff brought the present action, seeking, inter alia, to pierce S Co.'s corporate veil, to hold V joint and severally liable for the foreign judgment, and to enforce the foreign judgment against V personally. The plaintiff alleged that V, through his dominion and control of S Co., caused S Co. to fraudulently transfer funds to third parties for the purpose of shielding S Co.'s assets from the plaintiff. Prior to trial, the plaintiff requested the production of certain documents concerning V's estate planning, and V objected on the grounds that the request was overly broad and unduly burdensome, and that the material was protected by the attorney-client privilege. The trial court sustained the objection on the grounds that the request was overly broad and unduly burdensome but did so without prejudice to the plaintiff's right to file a narrower request at a later point. Thereafter, the plaintiff filed a pretrial motion in limine to preclude the defendants from offering evidence and testimony that V made the October, 2008 transfers for estate planning purposes. The trial court granted the motion insofar as it sought to preclude the admission of the privileged documents that V had refused to turn over during discovery, noting that the defendants were not seeking to introduce protected documents but, rather, testimony previously given during V's deposition that the October, 2008 transfers were made, in part, for estate planning purposes. At trial, V testified that, because S Co.'s accounts with the plaintiff held more than $1 billion as of October 7, 2008, he had decided to make certain payments and, as part of an ongoing estate planning process, to create a trust. The trial court asked V when he decided to set up the trust, and V replied that he had seen an email to his lawyers indicating that the process had begun on May 7, 2008. The plaintiff's counsel then moved to strike V's testimony on the ground that it violated the court's earlier ruling on the plaintiff's motion in limine. The trial court, however, declined to strike V's testimony and, following the con-

clusion of trial, found that the plaintiff had failed to prove its corporate veil piercing claim. In reaching its decision, the court applied the law of Turks and Caicos Islands and concluded that, although the evidence established that V dominated and controlled S Co. and commingled his personal funds with S Co.'s funds, the plaintiff failed to demonstrate that V initiated the October, 2008 transfers with the specific intent to leave S Co. unable to pay its debts to the plaintiff. Accordingly, the court rejected the plaintiff's claim that V should be held personally liable for the foreign judgment and rendered judgment for the defendants, from which the plaintiff appealed. On appeal, the plaintiff claimed that the trial court had improperly applied the law of Turks and Caicos Islands instead of the law of either Connecticut or New York, under which the plaintiff argued it would have prevailed, and that, even if the court had correctly determined that the law of Turks and Caicos Islands applied, it misinterpreted that law by requiring that the plaintiff demonstrate V's specific intent to deprive the plaintiff of funds. The plaintiff also claimed that the trial court had improperly admitted V's testimony that the October, 2008 transfers were executed for estate planning purposes, either because that testimony was precluded by the court's earlier ruling on the plaintiff's motion in limine or because it ran afoul of the at issue, or implied waiver, exception to the attorney-client privilege. *Held*:

1. The plaintiff could not prevail on its claim that the results of the trial would have been different if the trial court had applied New York or Connecticut law, or if it had correctly applied the law of Turks and Caicos Islands, as the trial court's factual findings foreclosed the plaintiff's claim under New York, Connecticut, and Turks and Caicos Islands law, and any error in the trial court's choice of law analysis or application of Turks and Caicos Islands law was therefore harmless:

    Although the law on corporate veil piercing is not coextensive in Connecticut, New York, and Turks and Caicos Islands, in all three jurisdictions, it is an extraordinary remedy that requires, at a minimum, a determination that the corporate form was used to promote a wrong or injustice and that a fundamental unfairness would result from a failure to disregard the corporate form, in none of the jurisdictions is it sufficient to show only that the defendant exercised complete domination and control over the corporation or commingled assets, but, rather, the party seeking to pierce the corporate veil also must show that the corporate form was a mere shell that was used primarily as an intermediary to perpetrate fraud or to promote injustice.

    In the present case, in absolving V of any wrongdoing with respect to the October, 2008 transfers and in rejecting the plaintiff's assertion that leaving S Co.'s corporate veil intact was fundamentally unfair, the trial court specifically found that the balance of equities favored V and that the plaintiff's effort to pierce S Co.'s corporate veil was simply an attempt to circumvent the negligence and incompetence that the plaintiff exhibited in failing to obtain a personal guarantee from V and to accurately record and value S Co.'s trades.

    After thoroughly reviewing the record, this court concluded that the plaintiff failed to satisfy its heavy burden of demonstrating that the trial court's specific equitable findings were clearly erroneous, as the trial court reasonably found that S Co. was not a mere shell used by V to conceal wrongdoing or to evade liability and that V had every intention of paying the margin calls, as evidenced by the large sum of money that he left, or reasonably thought he had left, in S Co.'s accounts at the plaintiff bank after initiating the transfers, and by the genuine shock that he exhibited upon learning of the shortfall in the accounts.

    Moreover, the record also supported the trial court's findings that the sum that V had left in the accounts was not an unreasonable amount, given what he knew at the time about S Co.'s potential loss exposure, the plaintiff's losses were largely the result of its own negligence and incompetence, insofar as it had agreed to provide back-office services for S Co.'s trading when it did not understand and could not accurately value S Co.'s trades, and any losses incurred by the plaintiff were the direct result of its failure over a two year period to accurately value and margin S Co.'s accounts.

2. The plaintiff could not prevail on its claim that the trial court had improperly admitted V's testimony that some of the October, 2008 transfers

were executed for estate planning purposes:

Contrary to the plaintiff's assertion, the admission of V's testimony did not violate the trial court's earlier ruling on the plaintiff's motion in limine, as nothing that occurred at trial contravened the strictures established by that ruling, which did not preclude V from testifying as to the timing of his decision to set up a trust or from testifying that some of the transfers were made for the purpose of funding the trust, no privileged documents were introduced by the defendants to establish or corroborate any factual claims regarding V's estate planning, the email that V referenced during his testimony was not offered into evidence, and the plaintiff's counsel did not request to view the email after V's testimony.

Moreover, there was no merit to the plaintiff's assertion that the admission of V's testimony implicated the at issue, or implied waiver, exception to the attorney-client privilege, which applies to aspects of the attorney-client relationship that a party has placed in issue and to which the party has impliedly waived the right to confidentiality, as V did not testify that he made the transfers on the advice of counsel for estate planning purposes but, at most, relied on the timing of the estate planning to establish that it predated the events of October, 2008, and, therefore, was not a pretextual, after-the-fact rationalization used to justify improper conduct.

Furthermore, the plaintiff could have accomplished its objective of demonstrating that there was no evidence that V had an estate plan other than V's uncorroborated testimony, while avoiding the privilege issues implicated by its broader discovery request, by filing a narrower request targeted at establishing the timing of V's estate planning, the plaintiff's counsel did not request to view the email referenced by V or seek an in camera review of it but, instead, moved to strike V's testimony regarding the estate planning in its entirety on the basis of an incorrect perception regarding the breadth of the court's earlier ruling, and the trial court was free to believe or disbelieve V's testimony concerning the timing of his decision to set up a trust, just as the plaintiff's counsel was free to argue that the trial court should not believe V's testimony in the absence of corroborating evidence.

Argued December 19, 2022—officially released May 30, 2023

*Procedural History*

Action seeking, inter alia, enforcement of a foreign judgment, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the Complex Litigation Docket; thereafter, the court, *Genuario, J.*, denied the plaintiff's motion for summary judgment and the defendants' motion for summary judgment, from which the plaintiff and the defendants filed separate appeals with the Appellate Court, *Alvord, Bentivegna* and *Pellegrino, Js.*, which affirmed the trial court's decision, and the plaintiff and the defendants, on the granting of certification, filed separate appeals with this court, which affirmed the Appellate Court's judgment; subsequently, the case was tried to the court, *Hon. Charles T. Lee*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the defendants, from which the plaintiff appealed. *Affirmed.*

*David G. Januszewski*, with whom were *Jennifer M. Palmer, Sheila C. Ramesh*, pro hac vice, and, on the brief, *Thomas D. Goldberg, John W. Ceretta* and *Sesi V. Garimella*, pro hac vice, for the appellant (plaintiff).

*Richard M. Zaroff*, pro hac vice, with whom were *Charles W. Pieterse* and, on the brief, *Wyatt R. Jansen, Thomas P. O'Connor* and *Ira S. Zaroff*, pro hac vice,

for the appellees (defendants).

*Opinion*

ALEXANDER, J. The plaintiff, Deutsche Bank AG (Deutsche Bank), brought this action against the defendants, Sebastian Holdings, Inc. (SHI), and Alexander Vik, SHI's sole shareholder and director, seeking, inter alia, to enforce an approximately $243 million foreign judgment (English judgment) against Vik.[1] Following a five day trial to the court, the trial court denied Deutsche Bank's requested relief and rendered judgment in favor of the defendants. On appeal,[2] Deutsche Bank claims that the trial court improperly declined to pierce SHI's corporate veil and to hold Vik jointly and severally liable with SHI for the English judgment. We disagree and affirm the judgment of the trial court.

The trial court's memorandum of decision sets forth the following relevant facts and procedural history. Vik, a citizen of Norway and Monaco, has a residence in Greenwich, Connecticut. Deutsche Bank is a corporation organized under the laws of Germany with branches around the world. Its wholly owned subsidiary, Deutsche Bank (Suisse) SA (DBS), is based in Geneva, Switzerland. Vik founded SHI in 1986 and C.M. Beatrice, Inc. (Beatrice), in 1988. Both companies are organized under the laws of Turks and Caicos Islands (TCI), a British territory. SHI is Vik's trading company, and Beatrice is his holding company. SHI did not maintain any formal financial statements, general ledger accounts, or other financial accounting systems. During the relevant time period, Vik was SHI's and Beatrice's sole shareholder and director, and he made all decisions concerning their operations. The companies were run from an office annex attached to Vik's home in Greenwich.

SHI became a client of DBS in 2004. At all times relevant to this appeal, Thomas Brugelmann was SHI's " 'relationship' manager and contact person at DBS . . . ." As such, he was responsible for ensuring a smooth relationship between SHI and DBS. "Vik considered . . . Brugelmann the '[chief operating officer]' of SHI at DBS and . . . granted [him] 'extra powers,' including . . . authority to deal with [Deutsche Bank's] London and . . . New York [offices] on SHI's behalf."

In September, 2006, Vik hired Klaus Said to trade a small foreign exchange (FX) portfolio on behalf of SHI. Said, a former global manager of FX at JPMorgan and Credit Suisse, worked out of Vik's office annex in Greenwich. Pursuant to an oral agreement between Vik and Said, Said would keep 10 percent of the profits resulting from his trades.

On November 3, 2006, Deutsche Bank entered into a FX prime brokerage agreement and various related agreements with SHI to provide back-office capabilities for Said's FX trading, which SHI could not provide for itself. All of the agreements were drafted by Deutsche

Bank. Deutsche Bank's basic functions as SHI's prime broker included "(1) credit intermediation, [which] permit[s] the client to trade with many banks through the prime broker, who serves as the counterparty, (2) back-office functions [such as] processing and confirming trades, and (3) risk control and management functions, including calculating limits, calculating margin requirements, [and] calculating exposures." (Internal quotation marks omitted.) Through a letter of authority, which Deutsche Bank also drafted, SHI authorized Said to trade on its behalf in various FX transactions and currency options. The letter placed no limitation on the size of Said's trades and contained no personal guarantee from Vik. Rather, in a related agreement, SHI pledged $35 million in assets held in an account at DBS as collateral for Said's trading. "The amount of the deposit remained unchanged from [November] 2006 until October 13, 2008, when it was increased to $40 million."

"As SHI's prime broker, [Deutsche Bank] booked the trades directed by . . . Said with other banks and financial institutions, acting as a counterparty. The parties referred to these trades by a variety of names, including 'EDTs' or exotic derivative transactions and 'TPFs' or target profit forwards. . . . [The trades] often involved options or bets on the forward movement of the currencies involved." Although the trades could be highly lucrative, they were extremely risky. "SHI's principal business relationship was with DBS in Geneva or secondarily with [Deutsche Bank's] London [office]; [however, Said's] account was handled by a team in New York referred to as PBFX. . . . [PBFX] assigned a newly hired, [twenty-four] year old technical associate . . . [with] no experience in [TPF or EDT] trades [to administer the account]. As time passed, [this employee] gave up accurately tracking the trades and [instead] approximated their details in [Deutsche Bank's] computer systems as best he could."

"At the beginning of 2008, SHI overall was extraordinarily successful," perhaps, as Vik testified, "the most successful company in Europe at that time." (Internal quotation marks omitted.) Between 2006 and 2008, Said's trading was so profitable that Vik was able to withdraw $96 million from Said's account.

"In the summer of 2008, the financial markets became increasingly volatile and teetered toward crisis. Respected financial institutions such as Lehman Brothers started to fail, and [American International Group, Inc.] 'was on the edge' . . . . Nevertheless . . . Said's trading continued to be profitable through the summer and early fall of 2008. As of August, 2008, [Said's account] was showing profits of roughly $70 million . . . ." On October 3, 2008, Said told Vik that "he expected to realize about $20 million in profits over the next twelve to fourteen trading days."

"However, throughout 2008, in the lead-up to Octo-

ber, 2008 . . . Said also discussed with . . . Vik his concerns about the amount of risk in his portfolio, especially with respect to the impact of volatility on the derivative trade risk . . . ." At the same time, Said reassured Vik that "he was managing the risk." In an email dated September 29, 2008, Said advised Vik that currency markets were " 'all over the place' . . . ." Vik replied that the situation was " 'scary, unpredictable and dangerous.' "

On October 6, 2008, in an early morning email, Said informed Vik that "market moves had 'taken some of [Said's positions] to their boundaries' and 'these [were] not just trades [he could] unwind' . . . ." Said stated that the trades could be " 'very rewarding in anything but the wildest moves but [did not] have too much liquidity, and if the market move[d] sharply and stay[ed] down, they [could be] dangerous.' " Later that day, Said advised Vik that his annual profits to date would not be sufficient if they unwound them, that he was " 'surprised' " that Deutsche Bank had not asked for more collateral considering the state of the financial markets, and that he was sure it would. Vik replied, " '[i]n that case, reduce positions as they come off, not a good time to add more collateral.' " Later that day, Said informed Vik that Deutsche Bank had " 'finally woken up' to the true extent of . . . Said's loss exposure and would likely seek additional collateral. By the end of the day, [Deutsche Bank] requested that SHI's collateral be increased by $5 million to $40 million."

On October 7, 2008, Vik met with Brugelmann and other bank officials at Deutsche Bank's London office. At the meeting, Deutsche Bank's staff congratulated Vik on how well SHI was doing in such " 'difficult and negative' " financial markets. Vik was also given a report showing that SHI's holdings at Deutsche Bank totaled approximately $974 million, with a cash balance of approximately $958 million, "subject to adjustments for other accounts." Although Vik was aware at the time that the report did not include Said's trades, "neither he nor [Deutsche Bank] knew the actual financial position of . . . Said's portfolio." As a result, Vik left the October 7 meeting feeling " 'super happy,' " believing that " '[e]verything was going really well' " and that SHI had approximately $974 million, " 'mostly in cash,' " in its Deutsche Bank accounts.

That afternoon, "Brugelmann wrote in an internal email that he [had] told . . . Vik . . . that '[Said's] account was in good order from a margin viewpoint.' In another internal [email] . . . to Klaus Halfmann, [Deutsche Bank's] head of credit risk management . . . Brugelmann [stated that Vik] 'is working on the assumption that the risk in the portfolio managed by [Said] is now captured adequately with the [$40 million] margin terms.' In the same email string . . . Halfmann wrote Michael Spokoyny of PBFX . . . '[w]e have recourse

to the borrower and that is good. However, you need to margin the account in a way that [PBFX] risk feels comfortable with the collateral and not rely on the recourse.' . . . Spokoyny replied, '[w]e feel that the proposed . . . margining requirement . . . closely captures the margin that we need at the current time and with the types of trades/currencies we have seen to date . . . . Overall, we feel that the proposed margin levels are fair/competitive. However, given that the portfolio can change with adverse market conditions like we've observed this week, we take comfort in knowing [that we can] rely on [Vik's] guarantee if necessary.' In reality, [Deutsche Bank] had not obtained any personal guarantee from . . . Vik."

In addition to the cash and cash equivalents of nearly $1 billion at Deutsche Bank, SHI also held assets in cash or cash equivalents approximating $635 million in accounts at HSBC, Den norske Bank (DnB), Merrill Lynch, and JPMorgan. As a result, as of October 7, 2008, Vik reasonably believed that SHI's assets totaled an equivalent of $1.6 billion. After meeting with Brugelmann, Vik "decided 'what to do with all that money.' This included repaying his father, putting cash into Beatrice to reduce debt and to execute estate planning, and paying himself capital distributions for various projects, while leaving hundreds of millions of dollars in SHI's accounts at [Deutsche Bank]."

"[Vik] then flew to Norway and, on October 8 [2008], directed the transfer of . . . approximately $160 million . . . from SHI's DnB account to VBI [Corporation (VBI)], [a] company owned by [his] father. . . . On October 9 . . . Vik traveled from Oslo to New York. . . . Said sent [him] a lengthy email that [he] reviewed in the limo[usine] from the airport on his way home to Greenwich. In that email . . . Said stated that, 'for the past year, Deutsche Bank gave us a free ride on these [trades] because [it] could not value them properly in [its] system. That was great while it lasted . . . [but Deutsche Bank has] woken up. We can drag this out for a bit, but we have to make two decisions,' i.e., unwind all the trades, which would be 'disastrous,' or post substantial collateral, basically, because [Deutsche Bank] would start evaluating these extended deals on an interim 'mark to market' basis at potentially very negative levels, rather than wait for them to cash out."

"[Vik] did not wish to pursue either of . . . Said's alternatives and felt it was impossible to face major losses on a $35 million investment. [It was at this moment that] . . . 'the first real alarm bell went off' [for Vik], meaning that [he realized that] Said's losses could exceed the $35 million collateral that [SHI had pledged in support of Said's FX portfolio] . . . and that SHI could be exposed to substantial losses. . . . His knowledge that . . . Said had exposures beyond the collateral pledged . . . was 'very worrisome.' On the other

hand . . . [any] departure from the $35 million collateral ceiling he thought was in place 'was not really such a problem' . . . [and] could be handled [by pledging] more collateral . . . ."

During October, 2008, SHI made thirteen transfers of assets (October transfers). "Eight of these were drawn from SHI's accounts with [Deutsche Bank] and totaled $297 million . . . . The other five came from SHI accounts with HSBC, JPMorgan and DnB . . . [and] totaled approximately $593 million."[3]

"On Friday morning, October 10 [2008] . . . Vik left Greenwich to attend his thirtieth college reunion at Harvard [University] . . . . [In an email] Vik . . . [asked Said to] '[p]lease put together a detailed plan on what we have and how we get out of everything . . . to get back to a sustainable level without getting killed.' . . . At some point between the afternoons of Friday, October 10, and Saturday, October 11 . . . Said told [Vik] that Rafael Quezada, [the] head of PBFX, had told him to expect a margin call on Monday [October 13, in the amount of $30 to $60 million]."

"On October 10 . . . Said [informed Vik] that his derivative range trades exhibited 'unlimited downside,' [and] carried 'disastrous risk,' and that, as a result, exiting them would lock in 'extraordinarily prohibitive' and 'massive losses' to the tune of 'several hundred million [dollars].' . . . Vik responded . . . 'I can't understand how [it] got so far away from $35 [million]. Have to get out [without] getting killed.' "

"On the evening of Saturday, October 11 [2008] . . . Vik was warned by . . . Said: 'Let's not kid ourselves—[Deutsche Bank] has the details of all the deals, and I worry that they want even more than what we discussed' regarding the pending margin call SHI was told to expect for Monday, October 13. . . . Said proposed a detailed plan to reduce exposure, which he said would leave them in a relatively safe position in a week's time. . . . On Sunday, October 12 . . . Vik decided to close out . . . Said's trades as best they could. This was an important decision because terminating certain deals prior to their end date can trigger substantial premium payments."

"During the week of October 13, 2008, [PBFX] scrambled to properly calculate the risk on . . . Said's trades, which led to . . . massive margin calls during the week ahead. . . . On Monday afternoon, October 13 . . . [Deutsche Bank] formally issued the first margin call for approximately $98,879,941 . . . . On Tuesday, October 14, . . . SHI satisfied the first margin call from assets held at [Deutsche Bank]. . . . Also, on October 14 . . . Vik acted to ensure that several of the October transfers were initiated, moving forward, or completed." See footnote 3 of this opinion.

At the end of the day on October 14, Said advised

Vik that a second margin call from Deutsche Bank was imminent and would be greater than the first. Shortly thereafter, Deutsche Bank issued a second margin call for approximately $202 million, which SHI satisfied in full on October 15. Because Vik had thought that the first margin call would satisfy SHI's obligations to Deutsche Bank, the size of the second margin call came as a "bad surprise," and he was admitted to Greenwich Hospital, where he was diagnosed with severe anxiety and panic attacks, and prescribed anxiety medication.

That same day, "Vik sent . . . Brugelmann an email saying that he had left him a voice mail but had not received a call back. In the email . . . Vik said, 'I am in utter disbelief and shock of the risks that [Deutsche Bank] accepted from third parties when all [Said] had was a capital base of $35 million. This has . . . generated . . . $300 million in margin calls in two days. Incredible. I have instructed [Said] to close out all positions as the opportunities to do that present themselves, especially positions that have turned into forwards.'"

After Vik sent the email, Deutsche Bank issued a third margin call for $124,513,350. On October 16, 2008, Deutsche Bank issued a fourth margin call for $175,087,929, which included the amount of the third margin call. As of that date, Vik had resolved to pay margin calls by closing out SHI's positions and had ruled out the possibility of using alternative funds available to SHI to pay the margin calls. At trial, Vik stated that, by October 16, the prospect of SHI's sending additional funds to Deutsche Bank in satisfaction of SHI's obligations was "inconceivable."

"On October 17, [2008] SHI made a partial payment of $100 million in connection with the third margin call. . . . On the same day, [Deutsche Bank issued] a fifth margin call for $34,886,361. [When] Brugelmann called . . . Vik to apologize . . . Vik was sobbing on the phone. . . . SHI paid the balance of the fourth margin call of $75 million on October 20. . . . SHI satisfied the fifth margin call on October 21 . . . . [Thus, from] . . . October 13 to October 17, SHI received margin calls totaling approximately $511 million . . . [which it] paid in full . . . from assets held at [Deutsche Bank]." After satisfying the fifth margin call, due to the information provided by Deutsche Bank on October 7 indicating total holdings of approximately $978 million, "Vik thought SHI had several [hundred million dollars] left in its [Deutsche Bank accounts] . . . . [At trial, the defendants'] experts calculated that assets worth approximately $280 million should have remained in the [accounts] as of October 21 . . . [a figure that Deutsche Bank] did not contest . . . ."

"Between October 17, and October 21, [2008, Deutsche Bank] did not make another margin call, and no evidence at trial suggested that . . . Vik or . . . Said believed that it would do so. . . . [A Deutsche Bank]

officer stated in [an] internal correspondence that [as of October 21] minimal SHI trades remained in its system, and 'everything seeme[d] good' . . . . However, at the same time, the team responsible for setting the margins discovered that the SHI cash balance in [its] system was not reflecting the payments being made in connection with SHI's futures trading (the 'ignored payments error')."[4]

"In an internal . . . teleconference on October 22 . . . [Deutsche Bank] officers realized that, because of PBFX's failure to properly evaluate and enter . . . Said's trades, SHI's account balances had been overstated by at least . . . $320 million, leaving SHI 'under water' by hundreds of millions of dollars. . . . Brugelmann and others on the call agreed to tell . . . Vik that they had performed a 'reconciliation' [that] had identified a shortfall but not to explain their mistakes. The call transcript, however, shows that [they] had not performed a reconciliation; they had [merely] identified an error in their systems."

"Later on October 22 [2008] . . . Vik participated in two high-level telephone calls with [Deutsche Bank officials] in which he was informed that the correction of computational errors in SHI's accounts revealed that [there] was in fact [a] deficit and that, as a result, [Deutsche Bank] was seeking a further margin payment of $300 million to $350 million. . . . The recordings of the conference calls were played at trial. When [Deutsche Bank] informed . . . Vik that there was a deficit of [approximately $300 million to $350 million] in the accounts . . . Vik exclaimed, '[w]hat,' and was plainly shocked. When . . . Vik asked how this was possible, a [Deutsche Bank] officer told him they had been 'counting things possibly slightly incorrectly' but did not explain the cause of the error. . . . [Vik informed Deutsche Bank] that SHI had no money to pay the shortfall."

"Vik also expressed shock that SHI [even] had a shortfall [given that Brugelmann had told him in early October] that . . . 'there was, like [five] or [six] billion kroners in . . . [SHI's accounts].' . . . When . . . Vik asked for an explanation . . . Brugelmann said that the account[s] had been 'depleted' in 'an unforeseen way.' "

"Vik was visibly distraught upon learning the amount of SHI's exposure. . . . Vik testified that he was sitting in his chair . . . [with] his head . . . literally under the table [during the calls]. [A] colleague [who was with him], Per Johansson, observed . . . Vik sliding down off his chair during [one of the calls], crouching over, and saying, '[t]here's no more money.' . . . Following the telephone calls . . . [Deutsche Bank] notified . . . Vik [via email] of a sixth margin call in [the amount of approximately] $309 million . . . . SHI did not satisfy the sixth margin call."

"By the end of October, all of SHI's accounts at [Deutsche Bank], HSBC, DnB, Merrill Lynch, and JPMorgan had been reduced to nominal amounts, so that SHI was effectively judgment proof. . . . On October 30, 2008, the CSCSNE Trust was created for the benefit of . . . Vik's children. . . . Vik transferred into the trust his ownership interest [in] Beatrice, whose assets included the $699 million [or more] that [he] had . . . transferred from SHI . . . earlier [in the month] and [all the shares in Confirmit AS (Confirmit) . . . .]" See footnote 3 of this opinion.

"On January 21, 2009, [Deutsche Bank] commenced an action [English action] against SHI [in the Queen's Bench Division of the High Court of Justice of England and Wales (English court)] to collect the amounts owed pursuant to the unpaid margin call, as well as interest and costs. SHI asserted counterclaims . . . seeking over $8 billion in damages from [Deutsche Bank]. Specifically, SHI alleged that [Deutsche Bank] had 'breached duties and contractual obligations to SHI, which resulted in funds not being available to SHI from which it could have minimized its losses.' SHI also raised numerous defenses to [Deutsche Bank's] claim, including that . . . Vik had SHI pay earlier margin calls under duress and that SHI was not obligated to pay the amounts due under the governing contracts because [Deutsche Bank] breached those written contracts, as well as various . . . oral agreements between the parties."

"On November 8, 2013, the English court issued [a] 431 page [decision in which it found] in favor of [Deutsche Bank] on its claims for damages and reject[ed] SHI's counterclaims. In an accompanying order, the English court [rendered] judgment in favor of [Deutsche Bank] and against SHI in the amount of $243,023,089, including interest up to the time of judgment, plus postjudgment interest and costs." (Footnotes omitted.)

On December 20, 2013, after SHI failed to pay the English judgment, Deutsche Bank commenced the present action against the defendants. In its complaint, Deutsche Bank alleged, inter alia, that, "[t]hrough his domination and control of SHI, Vik caused SHI to breach its contractual obligations to Deutsche Bank and to fraudulently convey funds to third parties for the inequitable purpose of shielding SHI's assets and defrauding Deutsche Bank out of [money] owed." The two count complaint sought a declaratory judgment piercing SHI's corporate veil and holding Vik jointly and severally liable with SHI for the English judgment. It also sought to enforce the English judgment against Vik under the Uniform Foreign Money-Judgments Recognition Act, General Statutes § 50a-30 et seq.

On November 7, 2014, the defendants filed a motion to strike Deutsche Bank's complaint, in which they argued that the substantive law of TCI applied to Deutsche

Bank's claims and that the allegations of the complaint were insufficient to state a cause of action thereunder. In response, Deutsche Bank argued that Connecticut's choice of law rules required the application of New York or Connecticut law to its claims because they were the jurisdictions with the most significant relationship to the parties' dispute. It also argued that, even if TCI law applied, the allegations of the complaint were sufficient to withstand a motion to strike. Although the trial court, *Genuario, J.*, agreed with the defendants that TCI law applied to the parties' dispute, it disagreed that the complaint failed to state a claim thereunder and, accordingly, denied the defendants' motion to strike. On the basis of the parties' extensive briefing on the subject, the court determined that TCI law is "a mixture of English common law, some English statutes, some local ordinances, as well as a number of international treaties to which the United Kingdom is a party" and that "a corporate veil can be pierced [under TCI law] only if there is some 'impropriety and that such impropriety [is] linked to the use of the [company's] structure to avoid or conceal liability.' . . . [T]he plaintiff [must] show both control of the company by wrongdoers and an impropriety that constitutes a misuse of the company by them as a device or facade to conceal their wrongdoing."[5]

Thereafter, the defendants and Deutsche Bank "both moved for summary judgment. In the defendants' motion, they argued that res judicata barred the present action because [Deutsche Bank's] claim seeking to pierce the corporate veil should have been raised in the English action. [Deutsche Bank], by contrast, argued in its motion that all questions of material fact with respect to its veil piercing claim previously had been decided by the English court and that Vik was collaterally estopped from denying that he is the 'alter ego' of [SHI] and personally liable for the English judgment. On October 22, 2015, by way of written memorandum of decision, the trial court denied both . . . motions for summary judgment.

"With respect to the defendants' motion for summary judgment, the [trial] court concluded that [Deutsche Bank's] veil piercing claim was not barred by the doctrine of res judicata because that claim was sufficiently different in nature from the breach of contract claims in the English action. With respect to [Deutsche Bank's] motion for summary judgment, the court concluded that Vik was not collaterally estopped from denying liability for [SHI's] debt because the issue was not actually or necessarily decided in the English action." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 174 Conn. App. 573, 578, 166 A.3d 716 (2017). The Appellate Court thereafter affirmed the trial court's rulings; id., 592; and this court, in a per curiam opinion, affirmed the Appellate Court's judgment. See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 331 Conn. 379, 381, 204

A.3d 664 (2019).

The case then proceeded to trial before the trial court, *Hon. Charles T. Lee*, judge trial referee. The court heard testimony from Vik, Vik's wife, Carrie Vik, Johansson, and two forensic accounting experts. The parties also submitted hundreds of pages of testimony from more than 20 witnesses and 450 exhibits. At the conclusion of the trial, the court issued a comprehensive memorandum of decision in which it rejected Deutsche Bank's claim that Vik should be held personally liable for the English judgment. In reaching its determination, the court accepted as the law of the case Judge Genuario's articulation of TCI law that, "in order to pierce a veil, it is necessary that the plaintiff show both control of the company by wrongdoers and an impropriety that constitutes a misuse of the company by them as a device or facade to conceal their wrongdoing."[6] (Internal quotation marks omitted.) To do this, the court explained, the plaintiff must demonstrate three things: (1) domination and control of the corporation by the alleged wrongdoer, (2) commingling of the corporation's assets with those of the wrongdoer or with entities controlled by him, and (3) specific intent by the wrongdoer to leave the corporation unable to pay its debts.

Applying this standard to the evidence adduced at trial, the trial court concluded that Deutsche Bank had met the first two prongs of the test. The court found that the evidence established unequivocally that "SHI had no separate mind of its own" from Vik and that "Vik completely dominated and controlled" SHI. The court also found that the evidence established that Vik "regularly used SHI funds for personal expenses and pet projects" and "regularly transferred massive funds between [SHI]" and his other companies "without any formality at all, as if transferring money from one pocket to another." "In fairness" to Vik, however, the court also found that Vik's "companies normally conducted internal transfers without documentation and that this lack of record keeping was not a product of stealth during the October transfers."

With respect to the third prong—whether Vik acted with the specific intent to leave SHI unable to pay its debts to Deutsche Bank—the trial court concluded that Deutsche Bank had failed to demonstrate that the October transfers constituted such an effort by Vik. To the contrary, the court found that Vik had every intention of paying the October margin calls and credibly believed that SHI had sufficient funds in its Deutsche Bank account to do so up until the moment that Deutsche Bank informed Vik of its failure to accurately value Said's trades.

The trial court determined that there was no evidence that SHI was a "mere shell" or that it was ever used by Vik "as a device or facade to conceal his alleged wrongdoing." The court found, rather, that, throughout

its eighteen year existence, SHI was a highly successful corporation "through which . . . Vik conducted most of his substantial business [dealings] . . . ." The court further found that, "[a]lthough SHI failed to keep any conventional business records, [Deutsche Bank] ha[d] not shown that such failure contributed to its loss."

Having had "ample opportunity to observe [Vik's] testimony and [to] evaluate his credibility," the trial court concluded that Vik never sought to avoid paying SHI's debt to Deutsche Bank and "credibly testified that he had believed [that] his exposure to losses from . . . Said's derivative trading was limited to the initial $35 million collateral . . . (increased to $40 million on October 6 [2008])." The court further found that Vik's belief concerning his potential loss exposure, though incorrect under the brokerage agreements that he had signed, "was not a rationalization constructed after the commencement of litigation" but, rather, a view Vik "consistently" expressed in emails and in meetings with Deutsche Bank officials "throughout the summer and fall of 2008."[7]

The trial court also found that, during the week of October 13, 2008, "Vik authorized the payment of $511 million to [Deutsche Bank] in five margin calls because his lawyer told him [that] he owed the money. After the fifth payment, [Vik] could reasonably have believed that SHI still had as much as $280 million remaining in [its Deutsche Bank] accounts."

Because "the financial world was in an unparalleled crisis [in October, 2008]," with many financial institutions "on the brink of collapse," the trial court found that "the most credible explanation of the October transfers [was] the simplest . . . Vik was trying to preserve his wealth for the benefit of his family, primarily by funding a trust with hundreds of millions of dollars. . . . However, one salient fact stands out . . . . Vik left more than $500 million in SHI's accounts at [Deutsche Bank]. In fact, he could have credibly believed that he had retained as much as $780 million in SHI's accounts at [Deutsche Bank]. SHI used this money to cover the first five margin calls during the week of October 13. . . . [Deutsche Bank's] contention that . . . Vik drained SHI's assets with the specific intent of rendering [SHI] unable to pay its margin calls is undermined by this salient fact, which [Deutsche Bank] chooses to ignore." The court concluded that, "[i]f . . . Vik had specifically intended to prevent payment of SHI's debts to [Deutsche Bank], he went about it in a remarkably incompetent way, and . . . Vik did not strike the court as financially incompetent."

The trial court further found that "Vik had no reason to think that the margin calls would exceed the nominal $780 million remaining in SHI's accounts at [Deutsche Bank]. The defendants' forensic accountant, Will Davies, said that '[i]t took an army of quants' to calculate the

final balance of . . . Said's derivative trades and that it was unlikely . . . Vik could have calculated it." The court concluded, therefore, that Deutsche Bank "[could not] successfully contend that . . . Vik acted with specific intent to deprive it of funds when he initiated the October transfers at a time when neither he nor [Deutsche Bank] knew the extent of the losses that were eventually calculated."

The court determined that, "[u]ltimately . . . Vik's purpose in directing the October transfers [was] irrelevant to the decisive issue in this case, considering that he actually reserved [more than one-half] billion dollars to cover SHI's unspecified debts to [Deutsche Bank], if not as much as $780 million. This was not an unreasonable action given what he knew at the time. . . . The court [did] not find fraud or deceit or illicit conduct in what . . . Vik did, i.e., distributing approximately $900 million of SHI's assets when he credibly believed [that] they totaled at least $1.65 billion and had no reason to believe [that] the remainder of approximately $750 million would be inadequate to cover any debt to [Deutsche Bank]. . . . In fact, the $250 to $280 million [that] . . . Vik had reason to believe would be left in [SHI's Deutsche Bank] accounts, after payment of the $511 million in margin calls, compares favorably to the amount of $234 million found owing by the English court." (Citations omitted.) The court further observed that Deutsche Bank's "extraordinary" "negligence and incompetence in calculating and reporting the status of . . . Said's trades" clearly "contributed to the harm it suffered."

Finally, because the concept of piercing the corporate veil is equitable in nature, the trial court made several additional findings concerning the equities and concluded that they favored Vik. In this regard, the trial court observed that "[Deutsche Bank's] contracts with SHI did not contain a personal guarantee by . . . Vik," a practice "so common" in the financial services industry that many Deutsche Bank personnel "incorrectly thought [that] there was one in place." According to the court, Deutsche Bank's "effort to pierce SHI's veil" was simply "an attempt to circumvent the lack of a [personal] guarantee." The court also emphasized that all "transfers out of SHI's [Deutsche Bank] accounts . . . were handled by [Deutsche Bank] itself" and that, "[f]ar from draining all of SHI's funds at [Deutsche Bank] . . . Vik left available in SHI's accounts at [Deutsche Bank] at least $511 million and paid them [upon] request." The court concluded that, "[b]ut for [Deutsche Bank's] error in calculation . . . Vik [reasonably] could . . . have believed that $250 million to $280 million remained in SHI's accounts at [Deutsche Bank], even after paying the $511 million," which "exceeded the amount of the ultimate shortfall." Accordingly, the trial court denied Deutsche Bank's request for a declaratory judgment and rendered judgment for the defendants.

On appeal, Deutsche Bank claims that the trial court erred in applying TCI law to its veil piercing claim. It argues that, under Connecticut's choice of law rules, the trial court should have applied New York or Connecticut law because they are the jurisdictions with the most significant relationship to the parties' dispute. It further argues that, had the trial court applied New York or Connecticut law, it would have prevailed because the trial court's findings compel the conclusion that SHI's corporate veil should be pierced under either state's law. Alternatively, Deutsche Bank asserts that, even if the trial court correctly determined that TCI law applied, it "misinterpreted and misapplied the relevant TCI legal standard" by requiring Deutsche Bank to prove that, when Vik initiated the October transfers, he acted with "specific intent" to deprive Deutsche Bank of funds. Deutsche Bank argues that, under TCI law, it was not required to prove that Vik acted with the heightened standard of specific intent, which is a criminal law standard, only that Vik "intended to move the funds out of [Deutsche Bank's] reach." Finally, Deutsche Bank argues that the trial court improperly admitted Vik's testimony that the October transfers were executed for estate planning purposes, in contravention of an earlier ruling granting Deutsche Bank's motion in limine to exclude testimony that the transfers were made in furtherance of preexisting estate planning goals. Deutsche Bank contends that this error was "not only . . . prejudicial but likely . . . outcome determinative given the trial court's prominent citation to . . . the testimony in its finding that [Deutsche Bank had] failed to meet its burden of proof . . . ."

The defendants respond, inter alia, that this court need not decide whether New York or Connecticut law applies to Deutsche Bank's claim because the trial court's determination that Vik did nothing wrong defeats the claim no matter which jurisdiction's law applies, including the law of TCI. The defendants further contend that Vik's testimony that some of the October transfers were executed for estate planning purposes did not violate the trial court's ruling on Deutsche Bank's motion in limine, but, even if it did, the error was harmless.

I

We begin with Deutsche Bank's claim that the trial court erred in applying TCI law and that, had it applied New York or Connecticut law, Deutsche Bank would have prevailed. We also address Deutsche Bank's claim that, even if TCI law applies, the trial court incorrectly interpreted it as requiring Deutsche Bank to prove that Vik acted with specific intent and that, had the trial court applied the correct standard under TCI law, Deutsche Bank would have prevailed. We disagree with both claims.

"Whether the circumstances of a particular case justify the piercing of the corporate veil presents a question of fact." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 234, 990 A.2d 326 (2010). Accordingly, we review the trial court's decision whether to pierce SHI's corporate veil under the clearly erroneous standard of review. See id. "A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Levine* v. *Sterling*, 300 Conn. 521, 535, 16 A.3d 664 (2011).

Under New York law, "[t]he party seeking to pierce the corporate veil bears the heavy burden of showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff [that] resulted in [the] plaintiff's injury . . . ." (Citations omitted; internal quotation marks omitted.) *Skanska USA Building, Inc.* v. *Atlantic Yards B2 Owner, LLC*, 146 App. Div. 3d 1, 12, 40 N.Y.S.3d 46 (2016), aff'd, 31 N.Y.3d 1002, 98 N.E.3d 720, 74 N.Y.S.3d 805 (2018). "[Although] complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the] plaintiff is required . . . ."(Citations omitted.) *In re Morris* v. *New York State Dept. of Taxation & Finance*, 82 N.Y.2d 135, 141–42, 623 N.E.2d 1157, 603 N.Y.S.2d 807 (1993).

In Connecticut, courts recognize two theories under which the corporate veil may be pierced, namely, the instrumentality rule and the identity rule.[8] See, e.g., *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 552–54, 447 A.2d 406 (1982). Under either rule, "veil piercing is not lightly imposed. [C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities. . . . Accordingly, the corporate veil is pierced only under exceptional circumstances, for example, [when] the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or [to] promote injustice." (Citation omitted; internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, 304 Conn. 128, 139, 37 A.3d 724 (2012). "The improper use of the corporate form is the key to the inquiry, as [i]t is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for

fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 233–34; see also *DeMartino* v. *Monroe Little League, Inc.*, 192 Conn. 271, 275, 471 A.2d 638 (1984) ("[w]hen the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded" (internal quotation marks omitted)).

Finally, under TCI law, the party seeking to pierce the corporate veil "[must] show both control of the company by wrongdoers and an impropriety that constitutes a misuse of the company by them as a device or facade to conceal their wrongdoing. . . . [A] company can be a facade even though it was not originally incorporated with any deceptive intent. . . . [T]he question is whether it is being used as a facade at the time of a relevant transaction. If so, the court may pierce the veil only so far as it is necessary to provide a remedy for the particular wrong [that] those controlling the company have done." (Internal quotation marks omitted.) *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 174 Conn. App. 584.

We conclude that the trial court's factual findings foreclose Deutsche Bank's claim under New York, Connecticut, and TCI law, and, therefore, any error in the trial court's choice of law analysis or application of TCI law was harmless. See, e.g., *State* v. *Campbell*, 328 Conn. 444, 529, 180 A.3d 882 (2018) ("[b]ecause we conclude that the defendant cannot prevail under either standard, it is not necessary for us to resolve which one applies"). Although the law on veil piercing is not coextensive in Connecticut, New York, and TCI, in all three jurisdictions, it is an extraordinary remedy that requires, at a minimum, a determination by the court that the corporate form was used to promote a wrong or injustice, and that a fundamental unfairness would result from a failure to disregard the corporate form. See 1 Fletcher Cyclopedia of the Law of Corporations (2022) § 41.25 ("Because the corporate veil piercing doctrine is one of equity, [when] no fraud is shown, a plaintiff must show that an inequitable result involving fundamental unfairness would result from a failure to disregard the corporate form. In other words, although corporate existence can be disregarded without a specific showing of fraud, it is necessary to show that an injustice would result if the corporate form were left intact." (Footnotes omitted.)). In none of the jurisdictions is it sufficient only to show that the defendant exercised complete domination and control over the corporation or commingled assets. See, e.g., *Naples* v. *Keystone*

*Building & Development Corp.*, supra, 295 Conn. 237. The party seeking to pierce the corporate veil must also show that the corporate form was "a mere shell . . . used primarily as an intermediary to perpetrate fraud or [to] promote injustice." (Internal quotation marks omitted.) Id.

In the present case, the trial court unequivocally absolved Vik of any wrongdoing vis-à-vis SHI's business dealings with Deutsche Bank and rejected Deutsche Bank's assertion that there was anything fundamentally unfair about leaving SHI's corporate veil intact. Indeed, the trial court found that "the balance of equities" favored Vik and that Deutsche Bank's effort to pierce SHI's veil was simply an attempt to "circumvent" the "extraordinary" "negligence and incompetence" Deutsche Bank exhibited in not obtaining a personal guarantee from Vik and in failing to accurately record and value Said's trades. See, e.g., *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 560–61 ("[T]his court does not and cannot rescue a party from its own unfavorable or unwise business dealings. A hard bargain is not enough to energize the equitable power to disregard the corporate form." (Internal quotation marks omitted.)). Deutsche Bank does not address these specific equitable findings in its appellate brief, but they are fatal to its claim under New York, Connecticut, and TCI law unless it can demonstrate that they are clearly erroneous. Having undertaken a thorough review of the record, we conclude that Deutsche Bank has not met its heavy burden.[9]

The trial court reasonably found, and the record supports, that SHI was never a mere shell or a device used by Vik to conceal wrongdoing or to evade liability. The trial court also found that Vik had every intention of paying the October margin calls, as evidenced by, among other things, the $780 million that he left—or reasonably thought he had left—in SHI's accounts at Deutsche Bank after initiating the October transfers, and the genuine "shock" he exhibited on October 22, 2008, upon learning of the shortfall in the accounts. There was also ample evidence supporting the trial court's finding that $780 million was not an unreasonable amount for Vik to leave in the accounts given what he knew at the time about SHI's potential loss exposure, which, even in the worst case scenario described in Said's emails, would not have exceeded $780 million and, in fact, did not exceed that amount. The record also supports the trial court's findings that Deutsche Bank's losses were largely the result of its own negligence and incompetence in agreeing to provide back-office services for Said's trading when it did not understand and could not accurately value the trades. Any losses incurred by Deutsche Bank are the direct result of its failure over a two year period to accurately value and margin Said's account. Accordingly, Deutsche Bank cannot prevail on its claim that the results of the trial

would have been different if the trial court had applied New York or Connecticut law, or if it had correctly applied TCI law.[10]

## II

We next address Deutsche Bank's claim that the trial court improperly admitted Vik's testimony that some of the October transfers were executed for estate planning purposes. Deutsche Bank argues that, "[a]t trial, there was no evidence other than Vik's uncorroborated testimony that he in fact had an estate plan, and the details and purpose of any such plan were never disclosed." Deutsche Bank contends that the admission of this testimony violated an earlier ruling by the trial court granting its motion in limine to exclude the testimony on the basis of Vik's refusal to turn over documents related to his estate planning, which Vik claimed were protected by the attorney-client privilege. Deutsche Bank argues that "Vik placed any privileged communications concerning his purported estate planning justification for [the] asset transfers at issue by claiming that they proved his innocent intent" and that the trial court's admission of Vik's estate planning testimony "ran afoul of the 'at issue' or 'implied' waiver [exception]" set forth in *Woodbury Knoll, LLC* v. *Shipman & Goodwin, LLP*, 305 Conn. 750, 780–81, 48 A.3d 16 (2012). The defendants disagree that Vik's testimony was inconsistent with the trial court's ruling on Deutsche Bank's motion in limine or that it implicates the "at issue" or "implied" waiver exception. We agree with the defendants.

The following facts and procedural history are relevant to our resolution of this claim. On October 31, 2014, Deutsche Bank filed a discovery request for production of all documents concerning the estate planning that Vik had described in his testimony in the English action, "including but not limited to correspondence with, documents received from, or documents sent to [his] advisors [at] Cummings & Lockwood, LLC, in Connecticut or Withers [LLP] in London . . . ." Vik objected to the request on various grounds, including that it was overly broad, unduly burdensome, and sought "documents and information protected by the attorney-client privilege and/or attorney work product doctrine."

At a May 1, 2015 discovery conference before Judge Genuario, the parties discussed Vik's objection to Deutsche Bank's discovery request and Carrie Vik's motion to quash a subpoena duces tecum seeking the same discovery. Judge Genuario observed that the motion to quash presented "an interesting issue because, generally, in a fraudulent conveyance action or a piercing a corporate veil action, the issue of estate planning is usually raised by the defendant to say, this was not conduct that is consistent with piercing the corporate veil; this was good faith estate planning. . . . I would be inclined to sustain an objection to documents concerning the Viks' estate planning, particularly, insofar

as it is addressed to . . . Carrie Vik. However, if that objection is pressed and I sustain [it], then I don't expect to hear from Carrie Vik on the [witness] stand that we did this because of estate planning because that would deprive [Deutsche Bank] of material that might be useful in cross-examination of Carrie Vik. So, those are my preliminary thoughts."

The defendants' counsel, Richard M. Zaroff, responded that the court was getting ahead of itself and that it was too early for him to know if he would interpose any such objection. Zaroff observed that the requested documents were voluminous, extremely sensitive, and may not even be relevant if the defendants prevailed on their claim regarding the correct legal standard to apply under TCI law. See footnote 6 of this opinion. Zaroff further argued that there were alternatives to turning the documents over to Deutsche Bank. He suggested, for example, that the court could conduct an in camera review of the documents to ascertain whether they supported Vik's testimony concerning the timing of his decision to set up a family trust. Mark R. Carta, counsel for Carrie Vik, then sought to clarify for the record that the documents in question were "attorney-client and spousal immunity privileged materials . . . on [their] face." Judge Genuario responded that this was "one of the reasons why [he was] inclined to sustain the objection." He added, however, that, "if Carrie Vik objects to disclosing these documents because they're privileged and then wants to come in and . . . say, look, this document shows this was legitimate estate planning, I think [Deutsche Bank] may or may not have a legitimate objection to that testimony, which I might [be] inclined to sustain. Now, those aren't rulings. I'm [just] putting everybody [on] notice, if you will." Thereafter, in a written order, Judge Genuario sustained Vik's objection to Deutsche Bank's request for production of the estate planning documents on the grounds that the request was "overly broad and unduly burdensome . . . ." He did so, however, "without prejudice to [Deutsche Bank's] right to refile a narrower request."

On October 22, 2019, shortly before the start of trial, Deutsche Bank filed a motion in limine to preclude evidence or arguments "supporting a claim that certain [October] transfers . . . were undertaken for the purpose of . . . Vik's estate planning." The trial court, *Lee, J.*, granted the motion but only insofar as it sought to preclude the admission of attorney-client privileged documents that Vik had refused to turn over during discovery. Specifically, Judge Lee ruled: "[Deutsche Bank's] motion in limine . . . seeks to preclude the defendants from offering testimony that . . . Vik's transfers in October, 2008, were made for estate planning purposes, when . . . Vik invoked the attorney-client privilege at [his] deposition as to what estate advice he received. . . . Vik identified the law firm and lawyer with whom he consulted, but [Deutsche Bank]

did not seek [third-party] discovery from that lawyer. However, it submitted relevant document requests to . . . Vik, to which he objected and sought a protective order. [Deutsche Bank] also served a subpoena duces tecum on [Carrie] Vik, to which she [responded by filing] a motion to quash. Judge Genuario indicated that he was inclined to grant the motion to quash but cautioned . . . the defendants [against] subsequently seeking to introduce evidence they had claimed was privileged . . . . *Now, the defendants are not seeking to introduce protected documents. They are seeking to repeat testimony previously given in [Vik's] deposition [that the October transfers were undertaken, in part, for estate planning purposes].* The court will not, a priori, exclude such testimony, but it will consider the strength of corroborating evidence in assessing its credibility." (Emphasis added.)

During the trial, in response to questioning by Deutsche Bank's counsel, Vik testified that, as of October 7, 2008, "there was . . . basically [one] billion dollars worth of cash equivalence [in SHI's accounts] at [Deutsche Bank], actually even more. And, so, at that point, we just said, okay, we are going to pay out various amounts to various parties. We . . . also had this estate planning process going where we were going to create a trust, and we were going to move Beatrice into that trust. And, so, we wanted to have more free assets in that company." Thereafter, Judge Lee asked Vik when he decided to set up the trust. When Vik responded that the process began on May 7, 2008, Judge Lee asked him how he remembered that date. Vik replied, "[b]ecause I've seen an email . . . for the lawyer . . . ." Judge Lee then ask, "so you have something from May, which shows you . . . decide[d] . . . [to] look into it?" Vik responded, "[w]e had been working for some time on how to do estate planning. And then, this was Cummings & Lockwood, [LLC]. . . . They . . . [then] sent us to Withers [LLP] in London to organize the trust." Judge Lee replied, "[o]kay, all right, yeah, I mean, it takes time to put these things together."

When Judge Lee finished questioning Vik, Deutsche Bank's counsel moved to strike Vik's testimony "concerning the estate planning basis for any of [the transfers], based on the withholding of documents." He argued that Judge Genuario had "warned" the defendants in 2015 that he did not want to see them "coming in here [at trial] talking about estate planning." Although he acknowledged that he may be "overstating" Judge Genuario's warning, he argued that "it was [the] subject of an in limine motion [that Judge Genuario granted]." Judge Lee responded that it was he who had ruled on the motion in limine and that he did not recall precluding questions about the timing of when Vik decided to set up a trust, only substantive attorney-client conversations involving "legal advice . . . ." Judge Lee advised Deutsche Bank's counsel to look at the ruling and, if it

turned out that his recollection of it was incorrect, he should "feel free" to move to strike the testimony. No such motion was ever made. With this background in mind, we turn to Deutsche Bank's evidentiary claim.

The applicable standard of review is well established. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only [when] there was an abuse of discretion and a showing . . . of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Tony M.*, 332 Conn. 810, 831, 213 A.3d 1128 (2019).

Contrary to Deutsche Bank's assertion, it is apparent from the record that the trial court's ruling on Deutsche Bank's motion in limine did not preclude Vik from testifying as to the timing of his decision to set up a family trust; nor did it preclude him from testifying that some of the October transfers were made for the purpose of funding the trust. The ruling precluded Vik from introducing documentary evidence that he previously had claimed was privileged to bolster his testimony. Nothing that occurred at trial contravened the strictures established by the trial court's ruling because no privileged documents were introduced by the defendants to establish or corroborate any factual claims regarding estate planning. In direct response to a question from the court about when the decision was made to set up the trust, Vik noted that he had seen an email to his lawyers indicating that the process began on May 7, 2008. The email was not offered into evidence, and Deutsche Bank's counsel made no request to view it after hearing Vik's testimony. See Conn. Code Evid. § 6-9.[11] We see no violation of any court order on this record.

Equally unavailing is Deutsche Bank's assertion that the admission of Vik's testimony implicates the at issue or implied waiver exception. Deutsche Bank contends that the "[d]efendants . . . were able to rely [on] Vik's testimony that he made transfers on [the] advice of counsel for estate planning purposes, while successfully resisting disclosure of the legal advice on which Vik purportedly relied." We previously have explained that "the at issue, or implied waiver, exception is invoked . . . when . . . a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship. In those instances, the party has waived the right to confidentiality by placing the content of the attorney's advice directly at issue because

the issue cannot be determined without an examination of that advice. If the information is actually required for a truthful resolution of the issue . . . the party must either waive the attorney-client privilege as to that information or it should be prevented from using the privileged information to establish the elements of the case." (Citation omitted; footnotes omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 52–53, 730 A.2d 51 (1999). However, "[m]erely because the communications are relevant does not place them at issue." Id., 54. "[T]he attorney-client privilege, like all other evidentiary privileges, may obstruct a party's access to the truth. Although it may be inequitable that information contained in privileged materials is available to only one side in a dispute, a determination that communications or materials are privileged is simply a choice to protect the communication and relationship against claims of competing interests. Any inequity in terms of access to information is the price [that it paid] to maintain the integrity of the privilege. An unavailability exception is, therefore, inconsistent with the nature and purpose of the privilege." (Emphasis omitted; internal quotation marks omitted.) *Hutchinson* v. *Farm Family Casualty Ins. Co.*, 273 Conn. 33, 40 n.3, 867 A.2d 1 (2005).

In the present case, Vik did not testify that "he made transfers on [the] advice of counsel for estate planning purposes," as Deutsche Bank asserts. Indeed, Vik places no reliance whatsoever on the substance or correctness of any legal advice; at most, he relies on the *timing* of the estate planning to establish that it predated, by months, the events of October, 2008, and, therefore, was not a pretextual, after-the-fact rationalization used to justify improper conduct. He testified that, as of October 7, 2008, SHI's accounts at Deutsche Bank held more than $1 billion in cash, that he decided "to pay out various amounts to various parties," and that they "had this estate planning process going where [they] were going to create a trust and . . . move Beatrice into that trust . . . so [they] wanted to have more free assets in that company." When the trial court interrupted Vik to ask when he decided to set up the trust, Vik responded, "May 7, 2008," at which point the court asked him how he was able to recall the date. Vik responded that he saw an email to one of his attorneys. Deutsche Bank's assertion that Vik testified "that he made transfers on [the] advice of counsel" is inaccurate and appears to represent an effort by Deutsche Bank to bring this case within the purview of the at issue or implied waiver exception, which is not implicated on this record.

Finally, we note that the trial court sustained Vik's objection to Deutsche Bank's request for production on the grounds that the request was "overly broad and unduly burdensome . . . ." The court's ruling stated that Deutsche Bank should refile a narrower request,

but it never did so. A revised request targeted at establishing the *timing* of the estate planning would have accomplished Deutsche Bank's central objective while largely or entirely avoiding the privilege issues implicated by the broader request.[12] Even when Vik mentioned the May 7, 2008 email during his testimony at trial, Deutsche Bank did not ask to see that email or request an in camera review of it. See Conn. Code Evid. § 6-9. Instead, Deutsche Bank's counsel moved to strike Vik's estate planning testimony in its entirety on the ground that it violated the court's earlier ruling on Deutsche Bank's motion in limine, which counsel incorrectly argued precluded Vik from testifying that some of the October transfers were undertaken for the purpose of funding a family trust. At that time, the trial court directed Deutsche Bank's counsel to review the court's ruling on the motion in limine and to renew the motion to strike if the testimony was in any way inconsistent with it, which counsel never did. On the basis of the record before us, we cannot conclude that the trial court erred in allowing Vik to testify as he did. Ultimately, the trial court was free to believe or disbelieve Vik's testimony concerning the timing of his decision to set up a trust, just as Deutsche Bank was free to argue that the trial court should not believe his testimony in the absence of corroborating evidence.[13] In light of the foregoing, Deutsche Bank cannot prevail on its claim that the trial court abused its discretion in allowing Vik's testimony, either because it was precluded by the court's ruling on Deutsche Bank's motion in limine or because it ran afoul of the at issue or implied waiver exception.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The English judgment was rendered by the Queen's Bench Division of the High Court of Justice of England and Wales in an action brought by Deutsche Bank against SHI that resulted in a $243,023,089 judgment, plus interest, against SHI. *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 174 Conn. App. 573, 576–77, 166 A.3d 716 (2017), aff'd, 331 Conn. 379, 204 A.3d 664 (2019).

[2] Deutsche Bank appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The October transfers consist of the following transactions. On October 8, 2008, Vik transferred a certified deposit worth approximately $160 million from SHI's DnB account to VBI. On October 9, he directed Brugelmann to transfer 9 million shares of Confirmit AS (Confirmit) stock from SHI's Deutsche Bank accounts to an SHI account at DnB that held additional Confirmit shares. Also on October 9, Vik directed an assistant to initiate the transfer of 1.5 billion Norweigan kroner (approximately $240 million) from SHI's Deutsche Bank accounts to SHI's HSBC account. On October 12, Vik emailed Carin Thoren, his assistant in Monaco, instructing her to " 'draft first thing wires request to send money' " from SHI's Deutsche Bank accounts to the following recipients: $10 million to a Uruguayan law firm; $10 million to Vik-Millahue Agricola y Viñedos Ltda., an entity associated with a Chilean vineyard that Vik owned; $10 million to an SHI account at JPMorgan; and approximately $6.8 million to Vik's personal account at Barclays Bank. On October 13, Vik transferred approximately $236 million in fiduciary deposits from SHI's HSBC account to Beatrice's HSBC account and approximately $230 million in Norwegian treasury bills from SHI's HSBC account to Beatrice's HSBC account. On October 14, Vik transferred $20

million from SHI's Deutsche Bank accounts to the HSBC account of Vik Beteiligung und Verwaltung GmbH, a company in which Vik held a 50 percent ownership interest. On October 15, Vik directed the transfer of all Confirmit shares from SHI's account at DnB to his personal account at DnB. On October 22, Vik transferred $2 million from SHI's Merrill Lynch account to XCelera, a communications company that he owned. On October 30, Vik transferred to the CSCSNE Trust, a revocable inter vivos trust created for the benefit of his children, his ownership interest in Beatrice, whose assets included the Confirmit shares and $699 million of funds he had transferred from various SHI accounts earlier in the month.

[4] At trial, the defendants' forensic economist explained the ignored payments error as follows: " '[T]he risk system, called DBAGX, was not reconciling properly with [the cash reporting] system. So, monies were being liquidated . . . from . . . a futures account, but money wasn't taken out in the DBAGX system . . . . So, the cash, as [far as] the margining team could see, was overstated against what the actual correct figure was.' "

[5] At trial, the parties agreed that English law applied to Deutsche Bank's veil piercing claim under TCI law.

[6] Prior to trial, in various motions and memoranda of law, the defendants argued that Judge Genuario's articulation of TCI law was not an accurate statement of the law and should not be applied. The defendants argued that more recent English case law "strongly disfavors veil piercing . . . and recognizes only one method to pierce the corporate veil, the so-called 'evasion' principle. That formulation requires that [Deutsche Bank] prove that . . . Vik interposed a corporation to defeat a preexisting, personal legal obligation, which the parties agree[d] [Deutsche Bank could not do] because [its] agreements were always with SHI and not . . . Vik." The trial court was not persuaded, concluding that, because the legal standard articulated by Judge Genuario was cited with approval in the Appellate Court's decision affirming the trial court's denial of the parties' motions for summary judgment; see *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 174 Conn. App. 584; it constituted the law of the case. The trial court further concluded that, even if "an appellate court were to disagree that Judge Genuario's formulation should be considered the law of the case . . . the outcome of this case would not change" because, under English law, the evasion principle on which the defendants relied applies only to reverse veil piercing claims, and the present case did not involve such a claim.

[7] Deutsche Bank argues that the trial court's finding that Vik credibly believed that SHI's exposure was limited to $35 million violated an earlier order by the trial court giving preclusive effect to the "holdings in paragraph 1426 (i)–(viii) of the English judgment . . . to the extent that they relate to identical issues in this case." We have read paragraph 1426 of the English judgment, which addresses SHI's counterclaims in the English action. We disagree that it precluded the trial court's finding regarding Vik's belief concerning the $35 million. Of relevance here is the English court's holding in subparagraph (vii) that, in October, 2008, Said and Vik were aware of Deutsche Bank's inability to accurately value Said's trades, and, therefore, Vik could not claim to have been "deceived" by Deutsche Bank's failure to disclose this information to him. Deutsche Bank does not explain how Vik's awareness of its inability to accurately value and to margin Said's portfolio is preclusive of the issue of whether Vik genuinely, albeit mistakenly, believed that SHI's risk exposure was limited to $35 million.

[8] "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. . . . The identity rule, on the other hand, has been expressed as follows: If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Saphir* v. *Neustadt*, 177 Conn. 191, 210, 413

A.2d 843 (1979).

[9] In arguing to the contrary, Deutsche Bank asserts that the trial court should have drawn different inferences from the evidence or not credited certain aspects of Vik's testimony. It points to what it believes are internal inconsistences in the trial court's decision. For example, it argues that the trial court's finding that the October transfers were not intended to render SHI unable to pay the October margin calls conflicts with the court's rejection of certain of Vik's explanations for some of the transfers, which the trial court concluded were post hoc justifications constructed in anticipation of litigation. Deutsche Bank also contends that the trial court's finding that "the most credible explanation of the October transfers is [that] . . . Vik was trying to preserve his wealth for the benefit of his family, primarily by funding a trust with hundreds of millions of dollars," is antithetical to its finding that the October transfers were not undertaken to avoid payment of the October margin calls. We are not persuaded by these or Deutsche Bank's other arguments, all of which mischaracterize and/or take out of context the trial court's findings and ignore the applicable legal principles, including the standard of review. They also rest on a theory of the case that the trial court rejected, namely, that Vik knew the full extent of SHI's loss exposure by early October, 2008, and immediately began to execute the October transfers to render SHI unable to satisfy its debt to Deutsche Bank. Deutsche Bank contends that it should have been obvious to the trial court that Vik's payment of the first $511 million in margin calls was simply the result of his inability to execute the October transfers fast enough, not evidence of his intent to pay the margin calls, as Vik claimed. Deutsche Bank's contention is unavailing. It is axiomatic that this court will not substitute its view of the evidence for that of the trial court. "[The trial] court, as the trier of fact and thus the sole arbiter of credibility, was free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 357, 999 A.2d 713 (2010). "Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.) *Frank* v. *Dept. of Children & Families*, 312 Conn. 393, 412, 94 A.3d 588 (2014).

[10] As previously indicated in this opinion, Deutsche Bank argues that, even if the trial court correctly determined that TCI law applied, it incorrectly required Deutsche Bank to prove that, when Vik initiated the October transfers, he knew the extent of Said's trading losses and "acted with specific intent" to deprive Deutsche Bank of the funds to cover them. Deutsche Bank contends that, under TCI law, it needed to prove only that "Vik intended to move the funds out of [its] reach." Even if the specific intent standard applied by the trial court was incorrect, it is clear from the court's memorandum of decision that the result of the trial would have been the same.

[11] Section 6-9 of the Connecticut Code of Evidence provides: "(a) While Testifying. Any object or writing may be used by a witness to refresh the witness' memory while testifying. If, while a witness is testifying, an object or writing is used by the witness to refresh the witness' memory, any party may inspect the object or writing and cross-examine the witness on it. Any party may introduce the object or writing in evidence if it is otherwise admissible under the Code.

"(b) Before Testifying. If a witness, before testifying, uses an object or writing to refresh the witness' memory for the purpose of testifying, the object or writing need not be produced for inspection unless the court, in its discretion, so orders. Any party may introduce the object or writing in evidence if it is otherwise admissible under the Code.

[12] Deutsche Bank argues in its appellate brief: "At trial, there was no evidence other than Vik's uncorroborated testimony that he in fact had an estate plan, and the details and purpose of any such plan were never disclosed."

[13] Deutsche Bank further argues that the trial court's reliance on Vik's estate planning testimony failed to comply with the court's ruling on the motion in limine because there was no evidence corroborating the testimony, and the ruling stated that the court would "consider the strength of corroborating evidence in assessing [the] credibility [of Vik's testimony]." We have no reason to believe that the court did not consider the strength of corroborating evidence in assessing Vik's testimony, as the court indicated it would do. We also disagree that there was no corroborating evidence. The CSCSNE Trust documents themselves were in evidence. The court reasonably could have inferred from them that a trust of its size and complexity could not have been conceived and executed in the span of three weeks but, rather,

as the trial court stated, that it "takes time to put . . . together." It is also clear from the court's memorandum of decision that it found Vik to be a credible witness. The court was ultimately persuaded that there was "[no] fraud or deceit or illicit conduct [of any kind] in what . . . Vik did, i.e., distributing approximately $900 million of SHI's assets when he credibly believed [that] they totaled at least $1.65 billion and had no reason to believe [that] the remainder of approximately $750 million would be inadequate to cover any debt to [Deutsche Bank]."

————————————————————