******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DEUTSCHE BANK AG *v.* CAROLINE VIK ET AL.
## (SC 20777)

D'Auria, Mullins, Ecker, Alexander and Dannehy, Js.

*Syllabus*

The plaintiff bank sought to recover damages from the defendants, A and his daughter, C, for, inter alia, their allegedly tortious interference with a business expectancy in connection with the plaintiff's efforts to collect an approximately $243 million foreign judgment that it had obtained against S Co., which the plaintiff claimed was a shell company controlled by A. The plaintiff previously had brought an action in which it sought to pierce S Co.'s corporate veil and to hold A jointly and severally liable for the foreign judgment. While that case was pending, the plaintiff commenced the present action, alleging, inter alia, that the defendants had attempted to interfere with a Norwegian court's order requiring the sale of S Co.'s shares in a Norwegian software company, N Co., to partially satisfy the foreign judgment. In its complaint, the plaintiff alleged that, beginning in 2016, the defendants had utilized various tactics to disrupt, delay, and otherwise interfere with the court-ordered sale of S. Co.'s shares in N Co., including having A's father, E, file numerous appeals challenging the Norwegian court's order and unlawfully request that the plaintiff's execution lien on the shares be removed from Norway's central securities depository to disrupt the sales process. The plaintiff also alleged that A had installed family members and close associates on N Co.'s board of directors to facilitate a plan to deplete N Co.'s assets and that A had submitted a fraudulent bid to purchase N Co. Moreover, the plaintiff alleged that A had forged a document purporting to grant C an irrevocable right of first refusal to purchase N Co., that C then invoked that purported right in an attempt to disrupt or halt the sale, and that A had directed C to file actions in a federal district court and in a Norwegian court in an attempt to enforce the fraudulent right of first refusal and to enjoin the sale of N Co. The plaintiff asserted that the defendants' conduct depressed both the indicative bids to purchase and the final sale price of S Co.'s shares in N Co. The defendants filed a motion to dismiss the present action for lack of subject matter jurisdiction on the ground that the plaintiff's claims were barred by the litigation privilege because they were based on communications made and actions taken in prior judicial proceedings. The trial court denied the motion to dismiss, and the defendants filed an interlocutory appeal with the Appellate Court, which reversed the trial court's decision and remanded with direction to dismiss the plaintiff's complaint in its entirety. On the granting of certification, the plaintiff appealed to this court. After the parties filed their briefs in the present appeal, this court issued its decision in *Deutsche Bank AG* v. *Sebastian Holdings*,

*Inc.* (346 Conn. 564), concluding that the trial court in the plaintiff's prior action properly had declined to pierce S Co.'s corporate veil and to hold A jointly and severally liable for the foreign judgment. *Held*:

1. The defendants could not prevail on their claim, raised for the first time during oral argument before this court, that the plaintiff's appeal was rendered moot by virtue of this court's decision in *Sebastian Holdings, Inc.*:

Although the defendants conceded in their supplemental brief that they had confused the concept of mootness, which implicates a court's subject matter jurisdiction, with the distinct and separate doctrine of collateral estoppel, which is an affirmative defense that may be waived if not properly pleaded, they nonetheless claimed that this court should decide the appeal on that alternative ground.

Even if this court had jurisdiction in an interlocutory appeal to decide an unpleaded and unadjudicated claim of collateral estoppel, the defendants did not adequately explain how any of the trial court's findings in *Sebastian Holdings, Inc.*, which concerned A's conduct prior to November 1, 2008, were preclusive of any issue in the present case, which concerned the defendants' alleged conspiracy beginning in 2016, and, therefore, this court declined to consider the matter further.

2. The Appellate Court incorrectly determined that the plaintiff's claims against the defendants were barred by the litigation privilege, and, accordingly, this court reversed the Appellate Court's judgment and remanded with direction to affirm the trial court's denial of the defendants' motion to dismiss:

Construing the complaint in the light most favorable to the plaintiff, this court concluded that many of the tactics A allegedly used to disrupt, delay, and otherwise interfere with the sale of N Co., including stacking N Co.'s board of directors with family members and associates, submitting a disingenuous bid to acquire N Co., coordinating with E to have the plaintiff's execution lien deregistered, and forging and backdating the document purporting to grant C a right of first refusal, occurred outside of the context of any judicial proceeding and, therefore, were not covered by the litigation privilege.

Moreover, all of the plaintiff's allegations that related to litigation concerned legal challenges advanced by either E or C, and it did not appear from the plaintiff's complaint that the defendants were parties to or otherwise participated in E's legal challenges in such a capacity as to warrant application of the privilege.

With respect to the legal challenges advanced by C, the plaintiff alleged in its complaint that A set the stage for C's litigation by forging the right of first refusal document and by directing C to file the actions in federal

District Court and in the Norwegian court, the litigation privilege does not apply to such extrajudicial misconduct, and the plaintiff's complaint did not allege that A was a party to or participated in C's actions in a manner that would entitle him to absolute immunity from claims arising therefrom.

Furthermore, although it was a closer question as to whether the litigation privilege applied to the actions C commenced in the federal District Court and the Norwegian court, this court concluded that, under the circumstances of this case, affording C absolute immunity was unwarranted because the plaintiff was not a party to C's actions, the plaintiff's claims were not premised on any statement made in those actions but, rather, on conduct that occurred outside of the actions, namely, the alleged conspiracy to interfere with the sale of N Co. and to drive down the sale price of S Co.'s shares in N Co., the allegedly fraudulent conduct did not commence during those actions, and C's actions were not the sole basis for or even central to the plaintiff's claims against the defendants but, rather, constituted but one facet of a broader extrajudicial conspiracy.

Argued November 14, 2023—officially released May 28, 2024

*Procedural History*

Action to recover damages for, inter alia, violation of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Hon. Edward T. Krumeich II*, judge trial referee, denied the defendants' motion to dismiss, and the defendants appealed to the Appellate Court, *Elgo, Clark* and *Lavine, Js.*, which reversed the trial court's decision and remanded the case with direction to grant the defendants' motion to dismiss; thereafter, the plaintiff, on the granting of certification, appealed to this court. *Reversed*; *judgment directed*.

*David G. Januszewski*, with whom were *Thomas D. Goldberg* and, on the brief, *Sheila C. Ramesh*, pro hac vice, *Sesi V. Garimella*, pro hac vice, *John W. Cerreta* and *Jennifer M. Palmer*, for the appellant (plaintiff).

*Monte E. Frank*, with whom were *Dana M. Hrelic* and *Meagan A. Cauda*, for the appellees (defendants).

*Opinion*

ALEXANDER, J. The plaintiff, Deutsche Bank AG, has spent the last decade attempting to collect from a nonparty, Sebastian Holdings, Inc. (SHI), an approximately $243 million foreign judgment (English judgment)[1] resulting from an unpaid margin call in 2008. In *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 346 Conn. 564, 294 A.3d 1 (2023), the plaintiff unsuccessfully sought to pierce SHI's corporate veil and to hold the defendant Alexander Vik (Alexander) jointly and severally liable with SHI for the English judgment.[2] Id., 568–69. While that case was pending in the trial court, the plaintiff commenced the present action against Alexander and his daughter, the defendant Caroline Vik (Caroline), alleging tortious interference with business expectancy and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., on the basis of the defendants' alleged efforts to interfere with the order of a Norwegian court requiring the sale of SHI's shares in a Norwegian software company in partial satisfaction of SHI's debt to the plaintiff. The defendants moved to dismiss the action, arguing that it was barred by the litigation privilege. The trial court denied the motion, and the defendants appealed to the Appellate Court, which reversed the trial court's decision and directed the trial court to dismiss the plaintiff's complaint in its entirety. See *Deutsche Bank AG*

---

[1] "The English judgment was rendered by the Queen's Bench Division of the High Court of Justice of England and Wales in an action brought by [the plaintiff] against SHI . . . ." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 346 Conn. 564, 568 n.1, 294 A.3d 1 (2023).

[2] The plaintiff's complaint in the present case alleges that, "[d]uring the period 1988 to 2015, [Alexander] owned 100 [percent] of the shares of SHI, a corporation incorporated under the laws of the Turks and Caicos Islands . . . . [Alexander] maintained sole ownership of . . . SHI . . . until approximately 2015, at which time he gave SHI to an entity controlled by Hans Eirik Olav, a personal friend and his 'right-hand' man for business dealings in Norway, for no meaningful consideration."

v. *Vik*, 214 Conn. App. 487, 511, 281 A.3d 12 (2022). We granted the plaintiff's petition for certification to appeal, limited to the issue of whether the Appellate Court correctly determined that the plaintiff's complaint was barred by the litigation privilege. See *Deutsche Bank AG* v. *Vik*, 345 Conn. 964, 964–65, 285 A.3d 388 (2022). During oral argument before this court, the defendants argued that this case was rendered moot by our decision in *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 564, which we issued after the parties had filed their briefs in this case. We conclude that the case is not moot and that the plaintiff's complaint is not barred by the litigation privilege. Accordingly, we reverse the judgment of the Appellate Court.

The plaintiff's complaint alleges the following relevant facts.[3] "Since 2013, [the plaintiff] has vigorously sought to collect [the English] judgment debt by undertaking a global enforcement effort, which include[d] filing actions in Connecticut, New York, Delaware, Pennsylvania, the United Kingdom, and Norway. At all times, SHI has claimed that it lacks sufficient assets to satisfy the English judgment. . . .

"This action concerns one such asset: shares in a Norwegian software company, Confirmit AS (Confirmit). In 2008, [Alexander] wrongfully caused SHI to transfer the shares in Confirmit to his personal account in order to keep those shares beyond [the plaintiff's] reach. . . . [With respect to] the English judgment, the . . . court found that the shares of Confirmit were one portion of the approximately $1 billion of assets that [Alexander] drained from SHI to avoid paying [the plaintiff] amounts owed. . . . In 2015, [Alexander] again purported to

---

[3] "Because . . . we review the trial court's ruling on a motion to dismiss, we take the facts to be those alleged in the complaint, construing them in a manner most favorable to the pleader." *Beecher* v. *Mohegan Tribe of Indians of Connecticut*, 282 Conn. 130, 132, 918 A.2d 880 (2007).

transfer those same shares, this time to his father, Erik Martin Vik [Erik], while the shares were the subject of litigation with [the plaintiff]."

The complaint alleges that, on April 13, 2016, the Oslo Court of Probate, Bankruptcy, and Enforcement (Oslo Enforcement Court) issued a decision declaring the English judgment to be an enforceable judgment in Norway. On April 26, 2016, the Oslo Enforcement Court granted the plaintiff's petition to execute a lien on the Confirmit shares. On December 21, 2016, following a trial, the Oslo Enforcement Court confirmed the validity of the plaintiff's execution lien and invalidated Alexander's transfer of the shares to himself in 2008 and to his father in 2015. As a result, the shares reverted to SHI and were thus subject to enforcement. Two years later, on May 24, 2019, the Supreme Court of Norway affirmed the Oslo Enforcement Court's ruling. On June 12, 2019, the enforcement officer issued a decision to commence the sale of the Confirmit shares and to appoint ABG Sundal Collier ASA (ABG) to oversee the sale. In June, 2019, as part of the sales process, ABG assessed the shares and determined their value to be between $100 and $150 million. During the first phase of the sale, ABG "communicated with approximately [seventy-two] potential buyers. By October, 2019, ten interested parties submitted indicative bids for the [shares]. In November, 2019, during the second phase of the sales process, two companies submitted final bids."

The complaint alleges that, as soon as the plaintiff obtained its execution lien in 2016, Alexander, operating through various Vik related entities and family members, engaged "in a series of vindictive maneuvers" intended to disrupt, delay, and otherwise interfere with the sale. Specifically, after the Oslo Enforcement Court ruled that SHI was the true owner of the shares, Erik, at the behest of Alexander, filed numerous baseless appeals challenging that determination. According to

the complaint, these appeals, and the uncertainty they created surrounding Confirmit's ownership, caused Confirmit to lose market share and "significantly contributed to reduced [bids] that . . . potential purchasers submitted during the sales process . . . ."

The complaint further alleges that, in September, 2017, Erik "requested that the execution lien be removed from the Confirmit shares in the VPS registry, the central securities repository in Norway," even though such removal was unlawful. According to the complaint, "[Erik's] request lacked any legitimate basis, and . . . was made in coordination with Alexander . . . in furtherance of the long-running scheme to obstruct [the plaintiff's] ability to recover on the English judgment." The complaint further alleges that, on January 27, 2020, "the Oslo Enforcement Court rejected [Erik's] plea to stop the Confirmit sale [based on the 2017] removal of the execution lien from the VPS registry. Noting that 'only the enforcement office may instruct a VPS account operator to delete a registered execution lien,' the Oslo enforcement court held that 'the application made [in] September, 2017, by [Erik] for deletion of the execution lien was unlawful.' "

Another tactic allegedly utilized by Alexander to disrupt, delay, and otherwise interfere with the sale of the Confirmit shares was to stack Confirmit's board of directors with Vik family members and close associates. According to the complaint, the plaintiff, fearful that the newly configured board would deplete Confirmit's assets, filed a petition for a preliminary injunction seeking to have the Viks and their associates removed from the board. On March 30, 2017, the Oslo Enforcement Court granted the petition. In doing so, the court expressed concern that allowing the Viks or their associates to remain on Confirmit's board increased the risk that " 'bad faith transactions may be implemented [by them] that reduce the value of the [company].' " The

court further stated that " 'Alexander . . . has systemically sought to withhold funds from service in payment of creditors by transferring assets' " and that it " 'must also be concluded that [his] family members and business advisers will act in accordance with [his] wishes.' " (Emphasis omitted.)

The complaint alleges that the plaintiff's fears regarding Alexander's stacking of Confirmit's board were realized in November, 2019, when Caroline, midway through the bidding process for the Confirmit shares, sought to invoke her rights under a "sham" agreement between her and SHI purporting to grant her an irrevocable right of first refusal (ROFR) to purchase 100 percent of Confirmit's shares. According to the complaint, SHI and Caroline "reached this purported agreement on the very same day [that the plaintiff] petitioned . . . to replace Confirmit's board . . . ." "As further evidence of fraud, the existence of the purported ROFR was not disclosed until July, 2019, in the midst of negotiations to sell [the] Confirmit [shares] and despite SHI's obligations to produce or disclose [any] such [agreement] in the course of various ongoing [litigation] between SHI and [the plaintiff]."

The complaint alleges that, on November 1, 2019, Caroline "provided ABG with a copy of the fraudulent ROFR . . . and requested information about [all] offers [to purchase the Confirmit shares, which] she claimed to be entitled to under the [agreement]." According to the complaint, after ABG informed Caroline "that, pursuant to Norwegian law, it could not consider the ROFR . . . in connection with the sale of [the] Confirmit [shares] because the . . . agreement was dated after [the plaintiff] . . . register[ed] its execution lien," Caroline commenced an action against ABG in the United States District Court for the District of Connecticut (Connecticut District Court action) seeking to enforce the fraudulent ROFR and to enjoin

the sale of the Confirmit shares. On December 4, 2019, the District Court denied her application for a preliminary injunction. Two days later, Caroline filed another petition, this time with the Oslo Enforcement Court, again seeking to enforce the ROFR. This petition also was denied. On February 11, 2020, the District Court issued an order to show cause why Caroline's action should not be dismissed. In response, Caroline "voluntarily dismissed" the Connecticut District Court action.

According to the complaint, Caroline's actions in Connecticut and Norway were "timed specifically to interfere with the forced sale of the Confirmit shares and the business expectations of [the plaintiff]. . . . The execution and attempted enforcement of [Caroline's] sham ROFR on which she based her requests for an injunction [were] for the sole purpose of interfering with the . . . sale . . . and had no proper purpose or justification." The complaint alleges that, in a recent court filing in Norway, Hans Eirik Olav, SHI's purported signatory on the ROFR, stated that he has no recollection of ever entering into a ROFR agreement with Caroline and that the document appears to him to be a forgery.

Another tactic allegedly utilized by Alexander to disrupt, delay, or otherwise interfere with the sale of the Confirmit shares was the submission of a fraudulent bid to purchase the shares. The complaint alleges that, on October 18, 2019, "[a]fter ABG initiated the first phase of the Confirmit sale process, [Alexander] submitted an 'all-cash' indicative bid to acquire the Confirmit shares for $325 million. He did so . . . in an effort to disrupt the sale process, which he intentionally manipulated by submitting [the] false bid under the cover of yet another shell company," Xcelera, Inc. (Xcelera), a company Alexander knew "could never have realistically advanced [$325 million to purchase the Confirmit shares]." According to the complaint, Alexan-

der's bid, which was "exponentially higher than [Confirmit's] estimated value," was "not a serious [bid] . . . ."

The complaint further alleges that ABG informed Alexander that "[t]he situation with Xcelera . . . as a potential buyer . . . [when] the validity of the sales process is being challenged by legal persons and individuals associated with [that company], requires certain specific procedures to be complied with and measures to be taken in order to ensure [the integrity of the sales process]." (Internal quotation marks omitted.) Concerned that Xcelera was controlled by Alexander, ABG requested that he provide information regarding Xcelera's ownership structure, board members, employees, and proof that it had sufficient funds to purchase the Confirmit shares. ABG also sought confirmation that Xcelera, SHI, and Alexander would not challenge the legality of the sales process. According to the complaint, no such information or assurances were forthcoming from Alexander. Instead, Alexander responded to ABG's request for information by asking ABG how it intended to "deal . . . with the rights of first refusal that exist [in connection with] the Confirmit shares." (Internal quotation marks omitted.)

The complaint finally alleges that, "[f]ollowing their repeated attempts to disrupt and otherwise interfere with the Confirmit sale process, the defendants succeeded in driving down both the indicative bids and final sale price for [the company]." Specifically, the complaint alleges that, "[a]s a direct result of the defendants' misconduct, the value of Confirmit, which was originally projected to be between $100 . . . and $150 million, fell to only $65 million, reducing the amount of debt that [the plaintiff] was able to recover by tens of millions of dollars." According to the complaint, Verdane, a European capital fund that ultimately purchased the Confirmit shares, "sent ABG a letter [on December

3, 2019] articulating its growing concerns about acquiring a company to which [Alexander] and related parties claimed rights. Specifically, Verdane noted that the purported ROFR, the [Connecticut] District Court [action], and the unlawfully deleted registration of the execution lien all contributed to what [it] perceived to be an increased risk of acquiring Confirmit." The final agreed on price when the sale finally closed on February 14, 2020, was $65 million, which was $5 million less than Verdane's final offer in November, 2019, and $35 million to $85 million less than the price ABG had placed on the shares in June, 2019.

Following the sale of the Confirmit shares, the plaintiff commenced the present action seeking damages for the defendants' misconduct resulting in the depressed price of the shares. The two count complaint alleged claims for tortious interference with business expectancy and violations of CUPTA predicated on the defendants' alleged efforts to interfere in various ways with sale of the Confirmit shares. The defendants responded by filing a motion to dismiss the action for lack of subject matter jurisdiction, arguing that the plaintiff's claims were barred by the litigation privilege because the claims were based on communications made and actions taken in prior judicial proceedings. The trial court disagreed and denied the motion. In so doing, the trial court observed that the litigation privilege affords absolute immunity for statements made in the context of judicial and quasi-judicial proceedings, even if the statements were intentionally false or defamatory. The court further noted, however, that the privilege does not apply to claims alleging abuse of process, vexatious litigation, and malicious prosecution because those claims do not seek redress for statements made or conduct occurring during the course of a judicial proceeding but, rather, allege that the proceeding itself was brought for an improper purpose.

Applying these principles to the plaintiff's complaint, the trial court concluded that the plaintiff's claims were not barred by the litigation privilege because the scheme alleged in the complaint did not involve the use of baseless litigation tactics only; it also involved extrajudicial misconduct to which the privilege does not apply. The court also concluded that the plaintiff's claims relating to prior judicial proceedings "do not concern how [those] cases were litigated, or the words used in communications by litigants or advocates . . . but, rather, they allege improper use of the judicial system for purposes not intended to further the course of justice but rather to pervert the course of justice. In this sense the claims are akin to claims for vexatious litigation, abuse of process, and malicious prosecution, and, unlike the . . . claims [to] which [the litigation privilege] has been held to apply to protect litigants for words used in [legal] communications [in order] to encourage robust use of the legal system . . . ." The court further concluded that "[t]he conduct alleged [in the plaintiff's complaint], sham transactions and forged documents that are falsely presented to judicial authorities in meritless [actions], goes well beyond alleged misconduct in advocacy of the sort that [has] been immunized to protect litigants from any chilling effect from the prospect of retaliatory litigation . . . ."

The defendants filed an interlocutory appeal from the trial court's ruling with the Appellate Court, claiming that the trial court incorrectly determined that the litigation privilege did not bar the plaintiff's claims. See *Deutsche Bank AG* v. *Vik*, supra, 214 Conn. App. 495. The defendants argued, inter alia, that the trial court not only misapplied the law governing the privilege, but it also erroneously determined that the plaintiff's allegations fell within the abuse of process exception to the privilege, despite the plaintiff's not having pleaded an abuse of process claim. Id. The Appellate

Court agreed with the defendants and reversed the trial court's decision. Id., 496, 511.

In reaching its determination, the Appellate Court noted that courts routinely have applied the litigation privilege to tortious interference and CUTPA claims if the allegations supporting those claims are based on communications or conduct occurring in the context of a judicial or quasi-judicial proceeding. Id., 496–97, 507–508. The court rejected the plaintiff's contention that "its complaint does not allege harm based on statements or communications uttered in the course of [judicial] proceedings, but [rather] for the wrongful conduct of abusing the judicial system to drive down the Confirmit shares' sale price." (Internal quotation marks omitted.) Id., 504. The Appellate Court reasoned that, "[a]lthough the plaintiff's complaint contains allegations that the defendant[s], through [their] litigation conduct, improperly used and abused the judicial process, unless the plaintiff's cause of action challenges the purpose of the litigation or litigation procedure, these allegations do not suffice to establish an improper use of the judicial system. A claim of abuse of process may be premised on the improper use of a particular judicial procedure. But allegations of the improper use of judicial procedure do not satisfy the requirement that the plaintiff's cause of action must itself challenge the purpose of the underlying litigation or litigation procedure." (Emphasis omitted; internal quotation marks omitted.) Id., quoting *Dorfman* v. *Smith*, 342 Conn. 582, 598–99, 271 A.3d 53 (2022). The Appellate Court concluded that, because the plaintiff's tortious interference and CUTPA claims do not challenge the purpose of an underlying judicial proceeding, the litigation privilege barred both claims. *Deutsche Bank AG* v. *Vik*, supra, 214 Conn. App. 506, 509–10.

The Appellate Court also rejected the plaintiff's contention that its complaint was not subject to dismissal

because it included numerous allegations unrelated to communications made in judicial proceedings; id., 510; which, alone, would suffice to support the plaintiff's claims, even if the litigation-related allegations were stricken from the complaint. The court stated: "Although the [plaintiff's] complaint does include allegations of extra-judicial conduct, [it] is permeated with allegations pertaining to the defendants' communications and participation in prior judicial proceedings, which are both central to the plaintiff's claims and inextricably intertwined with the allegations of extrajudicial conduct. Under these circumstances, we conclude that the plaintiff's claims are barred by the litigation privilege. To hold otherwise would permit parties to proceed with claims that otherwise are barred by the litigation privilege simply by adding allegations concerning conduct that is outside the privilege. Such a result would significantly undermine the objective the privilege was designed to promote." Id.

On appeal to this court, the plaintiff claims that the Appellate Court incorrectly determined that its claims are barred by the litigation privilege. The plaintiff argues that the Appellate Court's "sweeping, unexplained" statement that the allegations concerning the defendants' extrajudicial misconduct are " 'inextricably intertwined' " with the allegations concerning the defendants' litigation tactics is legally and factually unsupportable. The plaintiff contends that most of the allegations concerning prior judicial proceedings are unrelated to the plaintiff's claims and are included solely to provide "background" as to the parties' litigation history. Specifically, the plaintiff argues that, "[a]s a chronological matter, the . . . allegations of litigation-related conduct occurring before [Confirmit's] June, 2019 [valuation]—such as those describing the [defendants'] efforts between March, 2017, and May, 2019, to tie Confirmit up in the Norwegian courts—did not contribute to the

postassessment decline in Confirmit's price. Thus, [although] such earlier-in-time allegations provide important color on the [defendants'] propensity for abusive litigation, they are not a necessary predicate for [the plaintiff's] claims, and the [litigation] privilege should therefore not attach to them." According to the plaintiff, the only litigation-related conduct that postdates Confirmit's June, 2019 valuation involves Caroline's actions, which are not covered by the privilege because they do not seek to impose liability for anything Caroline did or said in those proceedings; rather, they seek to impose liability for her improper use of the judicial system as part of a "long-running and multipronged conspiracy, conceived and executed mainly out of court, to halt the Confirmit sale or, failing that, to depress Confirmit's sale price." The plaintiff finally argues that, even if we conclude that some of the allegations in the complaint are covered by the litigation privilege, the proper remedy is to strike the offending allegations from the complaint, not to dismiss the complaint in its entirety.

The defendants counter that the Appellate Court correctly determined that the plaintiff's entire complaint is barred by the litigation privilege. The defendants argue that the plaintiff's brief mischaracterizes the Appellate Court's decision and misapprehends this court's "clear [pronouncements] . . . as to when and where the litigation privilege applies." The defendants further contend that the plaintiff is simply attempting to rewrite its complaint on appeal in order to make it seem that the allegations related to the defendants' extrajudicial conduct are central to its claims when, in fact, they are not. According to the defendants, the plaintiff's contention that most of the litigation-related allegations are included solely to provide color and background to the parties' dispute does not withstand scrutiny. The defendants maintain, rather, that "the entire complaint

is centered around the . . . Norway and . . . Connecticut [District Court actions], the appeals that [Erik] took in Norway under [Alexander's] alleged direction and decision making, and the submission of allegedly manufactured evidence." The defendants further contend that, although the plaintiff may "in hindsight . . . wish it had alleged a count for abuse of process . . . it did not do so. . . . Instead, the plaintiff served a complaint containing two counts—tortious interference with business expectancy and a violation of CUTPA—both of which are premised on the defendants' conduct and communications in prior judicial proceedings," with nonessential "allegations of 'inextricably intertwined' extrajudicial conduct" "sprinkled in . . . ."

I

Before addressing the merits of the plaintiff's claims, we must resolve the defendants' contention, made for the first time during oral argument before this court, that the plaintiff's appeal was rendered moot by *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 564. Following argument, we ordered the parties to file supplemental briefs addressing this issue. In their supplemental brief, the defendants concede that they had confused mootness with the doctrine of collateral estoppel, or issue preclusion. See, e.g., *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 222, 982 A.2d 1053 (2009) ("[I]t appears that the defendant has confused the concepts of collateral estoppel and mootness. These concepts are separate and distinct. Collateral estoppel is an affirmative defense that may be waived if not properly pleaded. . . . Mootness, on the other hand, is a justiciability doctrine that implicates this court's subject matter jurisdiction . . . and, thus, cannot be waived and can be raised at any time." (Citations omitted.) However, the defendants persist in claiming that this court should decide the appeal on this alternative

ground because, they argue, the question of whether collateral estoppel applies is a question of law subject to plenary review, and "this court may properly decide it in the first instance and need not remand to the trial court for consideration of its application, especially [when] there are no undecided factual findings necessary for resolution of the claim."

Even if we have jurisdiction in an interlocutory appeal to decide an unpleaded and, as yet, unadjudicated claim of collateral estoppel, the defendants do not adequately explain how any of the trial court's findings in *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 564, are preclusive of any issue in this case. The prior case involved the narrow question of whether the trial court could pierce SHI's corporate veil and hold Alexander personally liable for the English judgment on the basis of conduct occurring prior to November 1, 2008. See id., 568–69. The present case involves whether the defendants were involved in a conspiracy between 2016 and 2020 to halt or delay the sale of a Norwegian software company in order to prevent the plaintiff from partially satisfying the English judgment. Because the defendants have failed to identify any material factual overlap between the two cases, we decline to consider the matter further and turn to the merits of the plaintiff's appeal.

II

The litigation privilege provides absolute immunity from suit and, therefore, implicates the court's subject matter jurisdiction. See, e.g., *Dorfman* v. *Smith*, supra, 342 Conn. 594. "When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it . . . must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks

omitted.) *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 626, 79 A.3d 60 (2013). Whether the litigation privilege applies in a given case is a question of law subject to de novo review. See, e.g., *Dorfman* v. *Smith*, supra, 594. When deciding whether the privilege applies, every presumption in favor of the court's jurisdiction should be indulged. See, e.g., *Priore* v. *Haig*, 344 Conn. 636, 645, 280 A.3d 402 (2022).

The litigation privilege is "a long-standing [common-law] rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Simms* v. *Seaman*, 308 Conn. 523, 537, 69 A.3d 880 (2013). "The privilege . . . applies to every step of the proceeding until [its] final disposition . . . including to statements made in pleadings or other documents prepared in connection with [the] proceeding." (Citation omitted; internal quotation marks omitted.) *Scholz* v. *Epstein*, 341 Conn. 1, 28–29, 266 A.3d 127 (2021). The privilege "originated in response to the need to bar persons accused of crimes from suing their accusers for defamation. . . . [It] then developed to encompass and bar defamation claims against all participants in judicial proceedings, including judges, attorneys, parties, and witnesses." (Citation omitted; internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 627. Subsequently, the privilege was expanded to bar a variety of retaliatory civil claims arising from communications or communicative acts occurring in the course of a judicial or quasi-judicial proceeding, including, but not limited to, claims for tortious interference, intentional infliction of emotional distress, fraud, and violations of CUTPA. See *Dorfman* v. *Smith*, supra, 342 Conn. 592, 616.

"The policy underlying the [litigation] privilege is that in certain situations the public interest in having people

speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . . Participants in a judicial process must be able to testify or otherwise take part without being hampered by fear of defamation [or other retaliatory litigation]. . . . [In] determining whether a statement is made in the course of a judicial proceeding . . . the court must decide as a matter of law whether the [alleged statement is] sufficiently relevant to the issues involved in . . . [the] proceeding, so as to qualify for the privilege." (Citations omitted; internal quotation marks omitted.) *Hopkins* v. *O'Connor*, 282 Conn. 821, 838–39, 925 A.2d 1030 (2007). "The test for relevancy is generous, and 'judicial proceeding' has been defined liberally to encompass much more than civil litigation or criminal trials." Id., 839.

This court has "recognized a distinction between attempting to impose liability [on] a participant in a judicial proceeding for the words used therein and attempting to impose liability [on] a litigant for his improper use of the judicial system itself. . . . In this regard, we have refused to apply absolute immunity to causes of action alleging the improper use of the judicial system." (Citation omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 629. Thus, we have held that "the litigation privilege does not bar claims for abuse of process, vexatious litigation, and malicious prosecution." *Dorfman* v. *Smith*, supra, 342 Conn. 592. We have done so because these claims seek to "hold an individual liable for . . . the improper use of the judicial process for an illegitimate purpose, namely, to inflict injury [on] another individual in the form of unfounded actions." *MacDermid, Inc.* v. *Leonetti*, 631; see also id. ("as a matter of public policy, we will not encourage [the improper use of the courts] by affording it the protection of [the litigation privilege]"). We have treated these claims differently in part because of

"restraints built into [them] by virtue of [their] stringent requirements." *Rioux* v. *Barry*, 283 Conn. 338, 347–48, 927 A.2d 304 (2007); see also *Scholz* v. *Epstein*, supra, 341 Conn. 21 ("[t]he plaintiff's statutory theft claim . . . is distinguishable from a vexatious litigation claim because the elements of the claim do not provide any safeguards to prevent inappropriate retaliatory litigation").

In *Simms* v. *Seaman*, supra, 308 Conn. 523, we identified the following factors that courts should consider when determining whether a claim is barred by the litigation privilege: "(1) whether the alleged conduct subverts the underlying purpose of a judicial proceeding, in a similar way to how conduct constituting abuse of process and vexatious litigation does; (2) whether the alleged conduct is similar in essential respects to defamatory statements, inasmuch as a defamation action is barred by the privilege; and (3) whether the alleged conduct may be adequately addressed by other available remedies." *Scholz* v. *Epstein*, supra, 341 Conn. 10–11; see *Simms* v. *Seaman*, supra, 308 Conn. 545–46. "Since . . . *Simms*, this court has clarified that these factors . . . are simply instructive, with the focus being on the issues relevant to the competing interests in each case in light of the particular context of the case. . . . We are not required to rely exclusively or entirely on these factors; rather, they are useful when undertaking a careful balancing of all competing public policies implicated by the specific claim at issue and determining whether affording [parties] this common-law immunity from this common-law action is warranted." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Scholz* v. *Epstein*, supra, 11–12.

Mindful of the foregoing principles and construing the complaint in the light most favorable to the plaintiff, we conclude that the Appellate Court erred in determin-

ing that the plaintiff's claims are barred by the litigation privilege. The complaint describes a multifaceted campaign by Alexander, undertaken between 2016 and 2020, to prevent the sale of the Confirmit shares or, failing that, to depress the sale price of the shares. As the plaintiff argues, many of the tactics allegedly employed by him to accomplish these goals occurred outside the context of any judicial proceeding and are therefore not covered by the litigation privilege. E.g., *Dorfman* v. *Smith*, supra, 342 Conn. 597 n.6 ("[t]he litigation privilege does not apply to conduct [or communications] not made in the course of a judicial proceeding"); *Hopkins* v. *O'Connor*, supra, 282 Conn. 849 ("[b]ecause . . . communication was not made pursuant to or in furtherance of a [judicial] proceeding, the trial court properly concluded that the defendant was not entitled to immunity on that basis"). The claimed extrajudicial tactics include installing family members and other close associates on Confirmit's board of directors, allegedly to deplete the company's assets; submitting a disingenuous bid to acquire the Confirmit shares, allegedly to deter other bidders; coordinating with Erik to have the plaintiff's execution lien deregistered from the VPS registry, allegedly to disrupt the sales process; and forging and backdating a document purporting to grant Caroline a right of first refusal to acquire the Confirmit shares, allegedly to inject doubt and uncertainty into the sales process, to deter bidders, and to drive down the sale price. Because these activities have no connection or logical relation to any ongoing judicial proceeding, they are not covered by the litigation privilege.[4]

---

[4] The defendants argue that "[the Appellate Court's] conclusion that any allegations of extrajudicial conduct are inextricably intertwined with [the plaintiff's allegations concerning prior judicial proceedings] is entirely consistent with the case law . . . governing application of the litigation privilege." As support for this contention, the defendants direct us to the portion of their brief describing the test this court has adopted for determining when a claim, even though it is predicated on statements or other communicative acts occurring *in the course of a prior judicial proceeding*, is not barred by the litigation privilege because the claim seeks to hold an individual

See, e.g., *Fiondella* v. *Meriden*, 186 Conn. App. 552, 562–63, 200 A.3d 196 (2018) (litigation privilege was inapplicable to "allegations . . . not predicated on statements made during the course of litigation, but [that were] based on the defendants' intentional conduct that did not occur during a judicial proceeding"), cert. denied, 330 Conn. 961, 199 A.3d 20 (2019).

Turning to the litigation-related allegations, we note as a threshold matter that all of the allegations underlying the plaintiff's claims concern legal challenges advanced either by Erik or Caroline.[5] With respect to Erik's legal challenges, which constitute the majority of the judicial proceedings referenced in the complaint,[6] it

liable for the improper use of the courts. See *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 629–31. We disagree that this portion of the defendants' brief supports their argument that the *extrajudicial* conduct at issue in the present case is covered by the privilege under an "inextricably intertwined" theory. Certainly, this court has not applied such a theory to deprive parties of their day in court, and the authority the defendants rely on does not suggest otherwise.

[5] The "background" section of the plaintiff's complaint includes six paragraphs describing the 2013 English action that resulted in the English judgment, which is the judgment the plaintiff sought to enforce in Norway beginning around 2016. Those six paragraphs contain eight subparagraphs detailing the English court's "various factual findings concerning [Alexander's] wrongful conduct, including that he had lied under oath, fabricated evidence, and instructed SHI's lawyers to pursue contrived arguments to support its case." The present action, however, is not predicated on the English court's findings; nor does it seek to impose liability on the defendants for anything that transpired in that case. Instead, it seeks to impose liability on the basis of events that occurred between 2016 and 2020 relating to the plaintiff's effort to enforce the English judgment in Norway. Although the background concerning the English action may be relevant to the present case, that background does not implicate the litigation privilege.

[6] Paragraphs 58, 65 through 73, 85, and 95 through 98 of the complaint all reference legal challenges undertaken by Erik between 2016 and 2020. As the Appellate Court noted, "many, if not the majority, of the plaintiff's allegations alleging frivolous or meritless litigation [tactics] arise out of [actions] commenced by the plaintiff itself. The complained of litigation primarily concerns [Erik's] conduct in defense of those [actions] and the prosecution of appeals." *Deutsche Bank AG* v. *Vik*, supra, 214 Conn. App. 505 n.7.

We note that the complaint also alludes to two additional appeals taken

does not appear from the complaint that the defendants were parties to those proceedings or otherwise participated in them in such a capacity as to warrant application of the privilege. The complaint alleges, rather, that "[Erik] filed various legal challenges . . . to the enforcement proceedings in Norway. While [these] tactics were meritless, they succeeded in dragging out the sales process over the course of several years. . . . On information and belief, this conduct has all been undertaken at the direction of and in coordination with Alexander . . . ."[7] Erik is not a defendant in this case, but, even if he were, and even if Alexander directed him to mount the aforementioned legal challenges, unless the defendants participated in those proceedings as parties or witnesses, the privilege does not attach to them. See, e.g., *Khan* v. *Yale University*, 347 Conn. 1, 19, 295 A.3d 855 (2023) ("doctrine of absolute . . . immunity . . . shields judges, parties, and witnesses from liability for their testimony in judicial and quasi-judicial proceedings"); see also *Wise* v. *Thrifty Payless, Inc.*, 83 Cal. App. 4th 1296, 1304, 100 Cal. Rptr. 2d 437 (2000) ("Nonparticipants and nonlitigants to judicial proceedings are never protected from liability under [the litigation privilege]. . . . Shorn of its adornments, [the defendant's] argument is in reality a plea for refuge from the consequences of its own tortious conduct under the blanket of a privilege enjoyed by a third party." (Citations omitted.)); 74 Am. Jur. 2d 750, Torts § 74 (2023) ("[t]hat one joint tortfeasor is protected against liability by a personal privilege does not affect

by SHI, in 2016 and 2017, related to the Oslo Enforcement Court's recognition of the English judgment. As with the litigation involving Erik, however, it does not appear from the complaint, which we must construe in the light most favorable to the pleader and to sustaining the court's jurisdiction, that the defendants participated in either of those appeals. The complaint alleges, rather, that Alexander had divested himself of SHI prior to the appeals.

[7] The defendants' memorandum of law in support of their motion to dismiss also states that Alexander was *not* a party to Erik's legal challenges in Norway.

the liability of the other tortfeasors"); 4 Restatement (Second), Torts § 880, p. 325 (1979) ("[i]f two persons would otherwise be liable for a harm, one of them is not relieved from liability by the fact that the other has an absolute privilege to act or an immunity from liability to the person harmed").

Caroline's actions are a different matter, but not as they relate to Alexander. As with the judicial proceedings involving Erik, the complaint does not allege that Alexander was a party to or participated in Caroline's actions in a manner that would entitle him to absolute immunity from claims arising therefrom.[8] The complaint alleges that Alexander operated "as puppet master" in "setting the stage" for the injunctive actions brought by Caroline. He did this, according to the complaint, by forging a document purporting to grant Caroline an irrevocable right of first refusal to purchase the Confirmit shares, which Caroline then presented to ABG with the aim of disrupting and/or halting the sale of the company. When this failed, he directed Caroline to commence actions in Connecticut and Norway against

---

[8] We note that the complaint alleges that Alexander filed two affidavits in the Connecticut District Court action (not the Norway action) describing how he "personally attempted to participate in the Confirmit sales process and [stating] that he had contacted ABG so that he could be considered a potential buyer in the process." The complaint further alleges that, "[a]ccording to [these] sworn statement[s], [Alexander] was located in Connecticut for a 'substantial portion' of his interactions with ABG." These affidavits have no bearing on our jurisdictional analysis because the plaintiff is not seeking to impose liability on Alexander on the basis of any statement he made in the affidavits. The allegations relating to the affidavits are set forth in the portion of the complaint titled "Jurisdiction and Venue" and are included to establish the court's personal jurisdiction over Alexander based on his statement that he was in Connecticut for a substantial portion of the time that he interacted with ABG concerning the sale. Although the complaint does seek to hold Alexander liable for his interactions with ABG prior to Caroline's actions, in particular his submission of an allegedly dishonest bid to purchase the Confirmit shares, as we explained, Alexander's conduct in this regard is not covered by the litigation privilege because it occurred entirely outside the context of any judicial proceeding.

ABG to enjoin the sale on the basis of the fraudulent ROFR. Suffice it to say that the litigation privilege provides no refuge for persons who engage in this type of extrajudicial misconduct. See, e.g., 4 Restatement (Second), supra, § 880, comment (a), p. 326 ("one who pays a witness to make a defamatory or otherwise harmful and untruthful remark [on] the witness stand is liable for the harm resulting to a third person although the witness himself . . . is immune from liability").

Whether Caroline can claim immunity with respect to her actions is a closer question. Filing an action is a quintessentially communicative act to which the litigation privilege ordinarily would apply if it were the sole basis for the plaintiff's complaint and the plaintiff was not claiming abuse of process or vexatious litigation. See *Dorfman* v. *Smith*, supra, 342 Conn. 597 ("even if the allegations in the complaint are sufficient to support a claim for vexatious litigation or abuse of process but such claims are not raised, these allegations do not remove immunity from a claim that falls within the scope of the litigation privilege"). The plaintiff contends, however, that the factors this court identified in *Simms* for determining whether the privilege should apply in a particular case militate against its application in the present case because (1) the alleged conduct subverts the underlying purpose of a judicial proceeding, in a similar way to how conduct constituting abuse of process and vexatious litigation does, and bears little resemblance to a defamation claim; (2) Caroline's actions are not the sole basis for the plaintiff's claims against the defendants but, rather, constitute but one facet of a broader extrajudicial conspiracy to interfere with the sale of the Confirmit shares and to drive down the sale price of the shares; (3) the plaintiff's action is not the type of retaliatory action the litigation privilege was intended to prevent because it does not seek to punish Caroline for statements she made in her actions

but, rather, for her improper use of the courts to accomplish a purpose for which they were not designed, namely, to further the aforementioned conspiracy; and (4) the plaintiff was not a party to Caroline's actions, and, therefore, the remedies generally available to deter misconduct of this nature are either unavailable to the plaintiff or are inadequate to address the full range and impact of the alleged misconduct. We agree with the plaintiff that, under the circumstances of this case, affording Caroline absolute immunity with respect to the allegations related to her actions is unwarranted.

We begin our analysis by noting that, even if we were to conclude that the allegations at issue are covered by the litigation privilege such that the plaintiff is precluded from using them against Caroline, Caroline would gain little from that determination. This is so because the other allegations concerning the fraudulent ROFR nevertheless remain in the case, including Caroline's alleged efforts to pass the document off to ABG as genuine. Indeed, even if the complaint were stripped of all references to Caroline's actions, the plaintiff's claims against the defendants would remain virtually unchanged, a fact that only underscores the actions' lack of centrality to the plaintiff's claims. It is also clear from the complaint that the plaintiff is not seeking redress for any statements Caroline made in the actions but, rather, seeks to hold her accountable for her role in an extrajudicial plot to interfere with the sale of the Confirmit shares through a variety of allegedly dishonest means, including the commencement of two actions when ABG refused to honor the fraudulent ROFR. Indeed, if ABG *had* honored the ROFR, Caroline would have had no reason to file the two actions. Under this alternative scenario, however, the plaintiff's action would have proceeded almost unchanged.

In this way, the present case is readily distinguishable from past cases in which we have held that the litigation

privilege barred a plaintiff's claims; in those cases, the claims were predicated entirely on statements made in the course of a judicial proceeding such that our application of the privilege disposed of the claims in their entirety. See, e.g., *Dorfman* v. *Smith*, supra, 342 Conn. 604–605 (claims were based solely on false statements in pleadings and other court documents); *Scholz* v. *Epstein*, supra, 341 Conn. 4 ("all of the defendant's alleged conduct occurred within the scope of the underlying foreclosure proceeding"); *Simms* v. *Seaman*, supra, 308 Conn. 528–29 (claims were based solely on statements and conduct occurring during judicial proceeding); *Rioux* v. *Barry*, supra, 283 Conn. 343 (claims were based solely on false statements made during quasi-judicial proceeding). Here, application of the privilege would yield no such result.

We agree with the plaintiff that the present case resembles *Fiondella* v. *Meriden*, supra, 186 Conn. App. 552, far more than it does any case in which the litigation privilege has been applied to bar a cause of action. As we observed about *Fiondella* in *Dorfman*: "In *Fiondella*, the defendants successfully brought an action seeking a declaratory judgment that they were the legal owners of a portion of land by operation of the doctrine of adverse possession. . . . The plaintiffs . . . who were not parties in the underlying declaratory judgment action, subsequently brought claims of fraud, slander of title, and civil conspiracy against the defendants, alleging that the defendants [had] intentionally concealed the declaratory judgment action from them, contrary to their property rights and interests. . . . The defendants filed a motion to dismiss on the ground of absolute privilege, which the trial court granted. . . . The Appellate Court reversed the trial court's judgment, holding that absolute immunity did not apply to bar the plaintiffs' claims. In so holding, the Appellate Court relied on the following facts: (1) the plaintiffs were

not parties to or involved in the underlying declaratory judgment action; (2) the claims were solely premised on conduct, not communications; and (3) the alleged fraud did not occur during the pendency of a judicial proceeding between [the] parties." (Citations omitted.) *Dorfman* v. *Smith*, supra, 342 Conn. 604 n.10.

In *Dorfman*, we emphasized the importance of the third factor, which reflects the litigation privilege's fundamental purpose of preventing retaliatory civil claims against a party opponent based on *statements* made by them in a judicial proceeding between the parties. Id. We then distinguished the complaint in *Dorfman*, which, unlike the complaint in *Fiondella*, clearly alleged dishonesty on the part of a party opponent based entirely on allegedly false statements made in an action between the parties, not on any type of conduct.[9] Id., 604–605.

In the present case, in contrast, the plaintiff was not a party to Caroline's actions, and its claims are not premised on any statement made in those actions but, rather, are premised on conduct (the alleged multifaceted conspiracy) occurring outside of the actions. Likewise, the alleged fraud did not commence during the actions but, rather, began months earlier with the alleged forgery of the ROFR. In essence, as alleged in the complaint, the actions were the defendants' attempt to defraud ABG by other means when their first attempt failed.

[9] Although, in *Dorfman*, the parties were opponents in the prior action that formed the basis of the dispute, the litigation privilege nonetheless may insulate a person from liability for statements made in a prior judicial proceeding irrespective of whether the party bringing the action was a participant in the prior proceeding. See, e.g., *Simms* v. *Seaman*, supra, 308 Conn. 537 ("communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy" (internal quotation marks omitted)).

In light of the foregoing, we are persuaded that the present case is not the type of action the litigation privilege was intended to prevent—retaliatory actions for statements (or other communicative acts) occurring in the course of a judicial proceeding. Accordingly, we conclude that affording Caroline absolute immunity with respect to the plaintiff's allegations concerning the Norway and Connecticut District Court actions is unwarranted.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.